UNITED STATES v. NORTH BLOOMFIELD GRAVEL-MIN. CO.

(Circuit Court, N. D. California.    June 8, 1897.)

1. CONSTITUTIONAL LAW—POWER OF CONGRESS OVER NAVIGABLE WATERS—OBSTRUCTIONS TO NAVIGATION.
    Congress has absolute power, in the interests of interstate and foreign commerce, over the navigable waters of the United States, and may declare what may or may not constitute obstructions thereto.

2. OBSTRUCTIONS TO NAVIGABLE WATERS—REGULATION OF HYDRAULIC MINING.
    The act of March 1, 1893 (27 Stat. 507), creating the California débris commission, and prohibiting and declaring unlawful hydraulic mining "directly or indirectly injuring the navigability" of the Sacramento and San Joaquin river systems, and requiring persons or corporations desiring to carry on hydraulic mining in the territory drained by those river systems to file a petition, setting forth the facts, to obtain permission from the débris commission to carry on such mining, etc., is to be construed as entirely prohibiting any hydraulic mining in said territory until such application has been made and permission given.    And the fact that prior to the passage of said act the United States had filed a bill to restrain a certain corporation from carrying on hydraulic mining so as to interfere with the navigability of such rivers, and that a decree had been entered adjudging that impounding works erected by the company pending the suit were sufficient to remove all injurious matter, and that the company could not thereafter be restrained under the then existing law, is no defense to a suit by the United States to enforce compliance with the act of 1893.

H. S. Foote, U. S. Atty., and Samuel Knight, Asst. U. S. Atty.

C. W. Cross and Chas. A. Garter, for respondent.

Robert T. Devlin, amicus curiæ.

ROSS, Circuit Judge. This case was submitted upon bill and answer. It involves the construction of the act of congress entitled "An act to create the California débris commission and regulate hydraulic mining in the state of California," approved March 1, 1893. 27 Stat. 507. The bill alleges the appointment and qualification of the commissioners provided for by that act, and the entry upon its duties by the commission. It alleges that the defendant company is, and was at the times mentioned in the bill, the owner and in possession of certain mining ground situated on or near the Yuba river and its tributaries, within the territory drained by the Sacramento and San Joaquin rivers, and is, and was during the times mentioned, engaged in working its mining ground by the hydraulic process; that the waters of the Sacramento river flow into Suisun Bay, and thence through the Straits of Carquinez into San Pablo Bay, and thence through the Golden Gate into the Pacific Ocean; that Feather river flows into the Sacramento, and that Yuba river flows into the Feather; that all of these rivers were, at the time of the cession of the territory of Upper California to the United States by the republic of Mexico, to wit, February 2, 1848, and ever since have been and now are, public navigable rivers, and free highways for the uses and purposes of commerce and navigation, and during all of the time mentioned were, and still are, navigable, and navigated by steamboats and other vessels, drawing from 8 to 16 feet of water, and engaged in commerce and navigation within the state of California; that the Sacramento river during all of the time mentioned was, and still is, so navigable and navigated by steamboats and other vessels from its mouth to the mouth of Middle creek, in Shasta county, above the point of confluence of the Sacramento and Feather rivers; that the Feather river during the same time was, and still is, so navigable from its mouth to the mouth of the Yuba river, and that the Yuba river during the same time was, and still is, navigable from its mouth to a point about one mile above its mouth; that all of the rivers mentioned have their principal sources in the western slope of the Sierra Nevada Mountains, which lie to the east and northeast of the Sacramento valley, through which the Sacramento river flows, and in a small part in the eastern slope of the Coast Range Mountains, which lie to the west of the Sacramento Valley; that all of the waters of the western slope of the Sierra Nevada Mountains which lies opposite the Sacramento valley are tributary to the rivers mentioned, and that they have their sources in lakes, springs, small streams, and canyons, which receive their waters from the rain and snow which fall each year to a great depth upon the mountains; that the defendant company, in working its mining ground, so dumps and discharges the débris therefrom as that the same, or a portion thereof, is ultimately carried and flows into the Yuba river and its forks, and, with the débris from other mining works operated by the same process, is thence so carried and flows

into the Feather, Sacramento, and other streams forming a part of and tributary to the Sacramento river system, and thence into the other waters, bays, and straits already mentioned; that hydraulic mining as now, and for more than 20 years last past, practiced and understood in the state of California, is a process of gold mining by which hills, ridges, banks, and other forms of deposits of earth which contain gold are mined and removed from their position by means of large streams of water, which, by great pressure, are forced through pipes terminating in nozzles known as "monitors" or "little giants"; that the water is discharged from such nozzles with great force, by a water pressure of from 50 to 400 feet per second, against and upon the hills, ridges, banks, and other deposits, which are usually shattered or broken up by means of blasts of powder, and softened by running water over and along such shattered or broken banks of earth, and undermined by streams of water flowing at the foot of such banks, thus caving down and washing off portions thereof before water is discharged from the nozzles against them; that the clay, sand, gravel, stones, rocks, and boulders of which such gold mines are composed, known as "mining débris," together with the gold contained therein, are carried and moved by the streams of water into and through flumes, sluices, and other conduits at or adjacent to the respective mining claims,—the gold being arrested therein, and the débris being carried by the water through the flumes, sluices, and conduits, and dumped or discharged into impounding basins or reservoirs, and that a part of such débris is thence carried and flows into the adjacent streams or canyons; that the larger and heavier portions of the débris are deposited in such impounding basins or reservoirs, and the smaller and lighter portions, being not less than 50 per cent. thereof, are carried down the streams, and lodged in the rivers and other channels and upon the lands adjacent thereto; that a portion of such mining débris, ever since the commencement of hydraulic mining within the state, has, during a large part of each year, been deposited and lodged, and is still being deposited and lodged, in the beds and channels of the rivers mentioned, and will continue to be so deposited and lodged while such hydraulic mining continues. The bill next alleges that the defendant company has failed and neglected and refused to file with the California débris commission a verified or any petition setting forth such facts as will comply with the act of congress upon the subject, and with the rules prescribed by the commission, and has not, nor has any one on its behalf, executed and acknowledged the conveyance mentioned in that act, and, notwithstanding such neglect and failure, that the defendant company has continued to mine, and is now engaged in mining, its mining ground by the hydraulic process. The prayer of the bill is for a writ of injunction perpetually enjoining the defendant, its agents, grantees, lessees, and employés, from operating or allowing to be operated by the hydraulic process its mining ground, until it shall make, present, and file with the débris commission the petition set forth in the aforesaid act of congress, accompanied by the conveyance therein mentioned, and otherwise conform to the

rules and regulations prescribed by the commission by virtue of that statute.

The answer of the defendant company admits the appointment of the commissioners, and their qualification and organization as alleged, and its failure to file with the commission the petition and conveyance mentioned in the act, and the fact of its mining its ground by the hydraulic process notwithstanding. It alleges that its mines and works are all situated adjacent to Humbug creek, a small tributary of one of the main branches of the Yuba river, and within the territory drained by the Sacramento river system. It admits the fact of the navigability of the Sacramento, Feather, and Yuba rivers, but denies the extent of the navigability alleged in the bill. It admits the sources of the rivers as alleged. It denies that it so dumps and discharges the débris from its mines and works, or any thereof, in such manner that the same, or any material portion of it, is ultimately carried or flows into the Yuba, Feather, or Sacramento rivers, or other streams forming a part of or tributary thereto, or upon the lands adjacent thereto; but avers that only a trifling quantity of the débris from the defendant's mining ground escapes from or passes beyond the impounding works and reservoirs of the defendant company, and that the same consists solely of light, flocculent matter of about the same specific gravity as water, and so finely comminuted as to readily float in and be moved by the slightest movement of the water in which it is suspended, and that all of the matter so escaping from or passing beyond the defendant's impounding works is carried in suspension in the streams of water until it reaches the Suisun Bay, and that from the head of Suisun Bay, by the tidal currents and movements of the water of that bay, of the Carquinez Straits, San Pablo Bay, and the Bay of San Francisco, and the tidal currents passing in and out of the Golden Gate, it is all carried and swept into the ocean at distances remote from the land or navigable streams of the state of California, and does not deposit in any place where it either injures, or threatens to injure, any navigable waters within the jurisdiction of the United States. The answer further denies that any portion of the débris from the defendant's mines or mining works, at any time since the passage of the act of congress in question, has been deposited or lodged in the beds or channels of either of the rivers named, and denies that any of such débris will be so deposited or lodged while it continues the mining of its ground by the hydraulic process. The answer further avers that about the years 1887 and 1888 the defendant erected upon its mining ground, which had been conveyed to it for placer mining purposes by the government of the United States, extensive, complete, and expensive impounding works, which have ever since been so maintained as to successfully, completely, and permanently impound all of the mining débris resulting from its mining operations, upon its mining ground, except such light and inconsiderable portion of the débris therefrom as will not settle in water when affected by the least motion, nor when such water is at rest, unless the same be maintained in a condition of rest for a long period of

time, and that such light and flocculent matter, when it passes from the defendant's impounding works, flows into Humbug creek, which creek flows with a rapid current into the South Yuba river, and that the South Yuba river flows with a rapid current into the Main Yuba river, and that the Main Yuba river flows with a rapid current into the Feather river, and that the Feather river flows with a rapid current into the Sacramento river; that the Sacramento river, with a moderate current, flows into Suisun Bay, and that from the head of Suisun Bay to the waters remote from the Golden Gate the waters are constantly agitated and rapidly moved by tidal currents, and that the light and flocculent matter which so escapes from the defendant's impounding works is carried by the currents of the streams mentioned, and by the tidal currents in the other navigable waters named, out of the Golden Gate, and to localities remote from the shores of the Pacific Ocean, and that no part thereof does injure or threatens to injure, either by itself, or in connection with débris from other mines, any of the navigable waters mentioned in the bill, or any other waters. The answer further alleges that on the 25th day of June, 1888, the United States filed in this court its bill in equity against this defendant, containing all of the averments of the present bill, except the allegations with regard to the act of congress of March 1, 1893 (which was not then in existence), and the appointment of the members of the commission thereby created, and the allegations with respect to the failure of the defendant to file with the commission the petition and conveyance required by that act; that thereafter, and on July 1, 1889, the defendant filed its answer to that bill of complaint, alleging the construction and maintenance of the aforesaid impounding works, and that thereby the débris from its mining ground was sufficiently and permanently impounded and restrained, as is alleged in the present answer, and that thereby the navigable waters mentioned were prevented from being injured or threatened with injury from the débris from the defendant's mines; that thereafter a trial was duly had upon the issues framed in the cause, upon which trial it was duly adjudged that the defendant's mining by the hydraulic process did not injure or threaten to injure the navigable streams, or any of the navigable waters, of the state of California, or any of the lands adjacent thereto, and that the defendant could continue its hydraulic mining operations by the use of its said impounding works without injuring or threatening to injure any of the navigable waters of the state of California, and without injuring or threatening to injure the navigability of any of the navigable streams of the state, and that ever since that time the defendant has maintained its said impounding works, and its hydraulic mining operations have ever since been conducted in the same manner (and in no other manner) that it was in that action adjudicated they might be without injury to any waters or lands; that the mining ground and works described in the bill in the present suit and in the bill in the former suit are the same.

As the case is submitted on bill and answer, such of the averments of the latter as are inconsistent with the allegations of the bill,

as well as the affirmative matter set up in defense of the suit, must be taken as true. It is thus made to appear that none of the débris from the mining ground or works of the defendant company is lodged or deposited in any of the navigable waters mentioned in the bill, or upon any land adjacent thereto; but, on the contrary, that such light, flocculent matter as escapes from the mines and impounding works of the defendant company is carried in suspension by the moving streams and waters into the Pacific Ocean beyond the jurisdiction of the United States. If, however, congress has, in the exercise of its power to declare what may or may not constitute obstructions thereto, by its act, prohibited the putting into the said navigable waters any such light, flocculent matter, there can be no doubt, I think, of the power of a court of equity to prevent, by writ of injunction, the unlawful act. In re Debs, 158 U. S. 565, 599, 600, 15 Sup. Ct. 900. The absolute power and control of congress over the navigable waters of the United States in the interest of commerce with foreign nations and among the several states, and its right to declare what may or may not constitute obstructions thereto, is thoroughly settled. Miller v. Mayor, etc., 109 U. S. 385, 3 Sup. Ct. 228; Cardwell v. Bridge Co., 113 U. S. 205, 5 Sup. Ct. 423; Escanaba & L. M. Transp. Co. v. City of Chicago, 107 U. S. 678, 2 Sup. Ct. 185; South Carolina v. Georgia, 93 U. S. 4; Gilman v. Philadelphia, 3 Wall. 713. Subject to this power on the part of congress, all of the navigable waters within the state of California are common highways. The state was admitted into the Union upon the condition, among other conditions, "that all of the navigable waters within the said state shall be common highways and forever free, as well to the inhabitants of said state as to the citizens of the United States, without any tax, duty, or impost therefor." 9 Stat. 452, 453. The important question in the case is, what has congress enacted in respect to the navigable waters mentioned in the bill, in connection with mining by the hydraulic process? There is but one act upon the subject, and that is the one the construction of which is here involved. To properly construe it, the conditions giving rise to its enactment must be considered. Long-continued mining by this process, in the territory drained by the rivers mentioned, had resulted in depositing in them and upon much of the adjacent land vast quantities of débris, thereby, to a great extent, impeding the navigation of the waters, and rendering valueless large quantities of otherwise fertile lands. This unfortunate condition of affairs necessarily gave rise to many and bitter contests in the courts between the conflicting interests. Some of the suits were brought in this court, and many of them in the courts of the state, resulting, ultimately, wherever it was shown that such hydraulic mining was causing injury to the public streams or waters, or to other's lands, in perpetually enjoining such mining. One of such suits was brought against the present defendant in this court to enjoin it from working by the hydraulic process the same mining ground it is now operating. That suit resulted in a decree enjoining the defendant from so working its mining ground; but the decree contained a provision to the effect that if, in the future, the defendant corporation should show to the court that it had constructed impounding reservoirs

which would successfully impound its mining débris, the decree might be modified so as to permit the operation of the mine. That case was tried and decided by Judge Sawyer, and is reported in 18 Fed. 753, under the title of Woodruff v. Mining Co. Some time after the making of the decree the defendant established a system of impounding works, and commenced again its mining operations. That action on the part of the defendant resulted in a suit brought in this court by the United States against the defendant to obtain an injunction prohibiting it from continuing its hydraulic mining operations. After a trial of that case, in which much testimony was introduced (53 Fed. 625), this court (Judge Gilbert presiding) found that by the construction and use of its impounding works the defendant prevented the escape of any débris from its mine into the navigable waters of the rivers mentioned that would tend to impair or injure their navigability, and therefore denied the injunction prayed for. In neither of these decisions was mining by the hydraulic process regarded, in and of itself, as unlawful. That it is not unlawful, but highly useful and commendable, when properly conducted, and without injury to the property or rights of others, hardly needs judicial decision. In Yuba Co. v. Cloke, 79 Cal. 239, 243, 21 Pac. 740, 741, the supreme court of California said:

"It seems to us it must be conceded that the business of hydraulic mining is not within itself unlawful or necessarily injurious to others. The unlawful nature of the business results from the manner in which it is carried on, and the neglect of parties engaged therein to properly care for the débris resulting therefrom, whereby it is allowed to follow the stream, and eventually cause injury to property situated below."

Nobody wanted gold mining by the hydraulic process stopped so long as it could be prosecuted without injury to the navigable waters, or to the property or rights of others. And so an effort was made by the parties most directly interested—the miners and agriculturists —to induce congress to legislate upon the subject, which effort resulted in the passage of the act of March 1, 1893. As enacted, after creating the California débris commission, and providing for the appointment of its members, and for the filling of vacancies occurring therein, and for the exercise of the powers conferred upon it, under the direction of the secretary of war and the supervision of the chief of engineers, and authorizing the commission to adopt rules and regulations not inconsistent with law, to govern its deliberations and procedure, the act declared the jurisdiction of the commission, in so far as the same affects mining carried on by the hydraulic process, to extend to all such mining in the territory drained by the Sacramento and San Joaquin river systems in the state of California. It declared, for the purposes of the act, "hydraulic mining" and "mining by the hydraulic process" to have the meaning and application given to those terms in the state of California. That meaning is sufficiently set out in the bill in the present case. The act prohibited and declared unlawful such hydraulic mining "directly or indirectly injuring the navigability of said river systems, carried on in said territory, other than as permitted under" its provisions. Sections 3, 22. But this was by no means the extent of the act or of its prohibition. Its very

purpose was to provide a means by which such mining could be carried on in the territory named without injuring the navigability of the said river systems, directly or indirectly. Recognizing the great damage that had been done to the navigable waters mentioned by hydraulic mining in the past, it created a commission of skilled officers to exercise the powers conferred upon it under the direction of the secretary of war and the supervision of the chief of engineers of the army, and by section 4 of the act made it the duty of the commission to mature and adopt, from examinations and surveys already made, and from such additional examinations and surveys as the commission should deem necessary, such plan or plans—

"As will improve the navigability of all the rivers comprising said systems, deepen their channels, and protect their banks. Such plan or plans shall be matured with a view of making the same effective as against the encroachment of and damage from débris resulting from mining operations, natural erosion, or other causes, with a view of restoring, as near as practicable and the necessities of commerce and navigation demand, the navigability of said rivers to the condition existing in eighteen hundred and sixty, and permitting mining by the hydraulic process, as the term is understood in said state, to be carried on, provided the same can be accomplished without injury to the navigability of said rivers or the lands adjacent thereto."

By section 5 of the act it is made the duty of the commission to—

"Further examine, survey, and determine the utility and practicability, for the purposes hereinafter indicated, of storage sites in the tributaries of said rivers and in the respective branches of said tributaries, or in the plains, basins, sloughs, and tule and swamp lands adjacent to or along the course of said rivers, for the storage of débris or water or as settling reservoirs, with the object of using the same by either or all of these methods to aid in the improvement and protection of said navigable rivers by preventing deposits therein of débris resulting from mining operations, natural erosion, or other causes, or for affording relief thereto in flood times, and providing sufficient water to maintain scouring force therein in the summer season; and in connection therewith to investigate such hydraulic and other mines as are now or may have been worked by methods intended to restrain the débris and material moved in operating such mines by impounding dams, settling reservoirs, or otherwise, and in general to make such study of and researches in the hydraulic mining industry as science, experience, and engineering skill may suggest as practicable and useful in devising a method or methods whereby such mining may be carried on as aforesaid."

Sections 9 and 10 of the act are as follows:

"Sec. 9. That the individual proprietor or proprietors, or, in case of a corporation, its manager or agent appointed for that purpose, owning mining ground in the territory in the state of California mentioned in section three hereof, which it is desired to work by the hydraulic process, must file with said commission a verified petition setting forth such facts as will comply with law and the rules prescribed by said commission.

"Sec. 10. That said petition shall be accompanied by an instrument duly executed and acknowledged as required by the law of the said state, whereby the owner or owners of such mine or mines surrender to the United States the right and privilege to regulate by law, as provided in this act, or any law that may hereafter be enacted, or by such rules and regulations as may be prescribed by virtue thereof, the manner and method in which the débris resulting from the working of said mine or mines shall be restrained and what amount shall be produced therefrom; it being understood that the surrender aforesaid shall not be construed as in any way affecting the right of such owner or owners to operate said mine or mines by any other process or method now in use in said state: provided, that they shall not interfere with the navigability of the aforesaid rivers."

Subsequent sections provide for a joint petition by the owners of several mining claims so situated as to require a common dumping ground or restraining works, and for proceedings of the commission thereon, including the provision contained in section 14, that upon the completion of such work as may be authorized and required by order of the commission—

"If found in every respect to meet the requirements of the said order and said approved plans and specifications, permission shall thereupon be granted to the owner or owners of such mine or mines to commence mining operations, subject to the conditions of said order and the provisions of this act."

Section 15 is as follows:

"Sec. 15. That no permission granted to a mine owner or owners under this act shall take effect, so far as regards the working of a mine, until all impounding dams or other restraining works, if any are prescribed by the order granting such permission have been completed, and until the impounding dams, or other restraining works, or settling reservoirs provided by said commission have reached such a stage as, in the opinion of said commission, it is safe to use the same: provided, however, that if said commission shall be of the opinion that the restraining and other works already constructed at the mine or mines shall be sufficient to protect the navigable rivers of said systems and the work of said commission, then the owner or owners of such mine or mines may be permitted to commence operations."

And by section 17 it is declared:

"That at no time shall any more débris be permitted to be washed away from any hydraulic mine or mines situated on the tributaries of said rivers and the respective branches of each, worked under the provisions of this act, than can be impounded within the restraining works erected."

From these provisions (and there is nothing in the act to the contrary) it seems quite clear to me that its real intent and meaning is to prohibit and make unlawful any and all hydraulic mining in the territory drained by the Sacramento and San Joaquin river systems in the state of California directly or indirectly injuring the navigability of said river systems, and to permit it in all cases where the work can be prosecuted without such injury to the navigability of the said river systems, or to the lands adjacent thereto; that, in order to properly determine the facts upon which the legislative will is to act, a skilled commission is created, whose duty it is to ascertain and determine what will or will not cause the prohibited injury, and to prescribe the character of impounding works, and the extent to which hydraulic mining in the territory described may be carried on without causing such injury.   To give effect to this manifest purpose, congress, in effect, enacted that until the commission should find that such mining can be carried on without causing the prohibited injury, all hydraulic mining within the territory drained by the Sacramento and San Joaquin river systems is unlawful; for by section 9 it is in terms declared that any person or corporation owning mining ground in that territory, "which it is desired to work by the hydraulic process, must file with said commission a verified petition setting forth such facts as will comply with law and the rules prescribed by said commission," accompanied by the instrument described in the next section; that is to say: "An instrument duly executed and acknowledged as required by the law of the said state, whereby the owner or owners of such mine or mines surrender

to the United States the right and privilege to regulate by law, as provided in this act, or any law that may hereafter be enacted, or by such rules and regulations as may be prescribed by virtue thereof, the manner and method in which the débris resulting from the working of said mine or mines shall be restrained and what amount shall be produced therefrom; it being understood that the surrender aforesaid shall not be construed as in any way affecting the right of such owner or owners to operate said mine or mines by any other process or method now in use in said state: provided, that they shall not interfere with the navigability of the aforesaid rivers." The plain meaning of the provision that any person or corporation owning mining ground within the territory drained by the rivers mentioned, which it is desired to work by the hydraulic process, must file a certain described petition, is that, unless such petition be filed, such ground shall not be worked. Confirmation of this is found in the express declaration contained in section 17, "that at no time shall any more débris be permitted to be washed away from any hydraulic mine or mines situated on the tributaries of said rivers and the respective branches of each, worked under the provisions of this act, than can be impounded within the restraining works erected," and in other clauses of the act already cited.

As has been already observed, the right of congress to say what may or may not constitute an obstruction of the navigable waters between the states or connecting with the ocean is well settled. Light, flocculent matter escaping from one or more mines worked by the hydraulic process and carried into such waters may not tend to injure their navigability, but such matter, in connection with similar matter from a great many other mines, may do so. It was the right of congress to put a stop to the working of all mines that contribute in any degree to such injury, and to prescribe the conditions upon which such work so contributing might be prosecuted. In some of the contests that were brought before the courts prior to the passage of the act in question it was held that any and all persons and corporations contributing to the injury should be enjoined. Woodruff v. Mining Co., supra; People v. Gold Run Ditch & Min. Co., 66 Cal. 138. 4 Pac. 1152, and cases there cited. In the case of Miller v. Mayor, etc., 109 U. S. 385, 3 Sup. Ct. 228, congress had passed an act (15 Stat. 336) authorizing the construction of a bridge over East river between the cities of New York and Brooklyn, and declaring that when completed it should be—

"A lawful structure and post road for the conveyance of the mails of the United States. Provided, that the said bridge shall be so constructed and built as not to obstruct, impair, or injuriously modify the navigation of the river; and in order to secure a compliance with these conditions the company, previous to commencing the construction of the bridge, shall submit to the secretary of war a plan of the bridge, with a detailed map of the river at the proposed site of the bridge, and for the distance of a mile above and below the site, exhibiting the depths and currents at all points of the same, together with all other information touching said bridge and river as may be deemed requisite by the secretary of war to determine whether the said bridge, when built, will conform to the prescribed conditions of the act, not to obstruct, impair, or injuriously modify the navigation of the river."

The second section of the act was as follows:

"That the secretary of war is hereby authorized and directed, upon receiving said plan and map and other information, and upon being satisfied that a bridge built on such plan, and at said locality, will conform to the prescribed conditions of this act, not to obstruct, impair, or injuriously modify the navigation of said river, to notify the said company that he approves the same, and upon receiving such notification the said company may proceed to the erection of said bridge, conforming strictly to the approved plan and location. But until the secretary of war approve the plan and location of said bridge, and notify said company of the same in writing, the bridge shall not be built or commenced; and should any change be made in the plan of the bridge during the progress of the work thereon, such change shall be subject likewise to the approval of the secretary of war."

It was contended by the plaintiff in the case, who sought to restrain the building of the bridge, that congress could not leave it to the secretary of war to determine whether the proposed construction would be an obstruction to the navigation of the river; but the court answered:

"By submitting the matter to the secretary, congress did not abdicate any of its authority to determine what should or should not be deemed an obstruc tion to the navigation of the river. It simply declared that, upon a certain fact being established, the bridge should be deemed a lawful structure, and employed the secretary of war as an agent to ascertain that fact. Having power to regulate commerce with foreign nations and among the several states, and navigation being a branch of that commerce, it has the control of all navigable waters between the states, or connecting with the ocean, so as to preserve and protect their free navigation. Its power, therefore, to determine what shall not be deemed, so far as that commerce is concerned, an obstruction, is necessarily paramount and conclusive. It may, in direct terms, declare absolutely or on conditions that a bridge of a particular height shall not be deemed such an obstruction, and, in the latter case, make its declaration take effect when those conditions are complied with. The act in question, in requiring the approval of the secretary before the construction of the bridge was permitted, was not essentially different from a great mass of legislation directing certain measures to be taken upon the happening of particular contingencies or the ascertainment of particular information. The execution of a vast number of measures authorized by congress, and carried out under the direction of the heads of departments, would be defeated if such were not the case. The efficiency of an act as a declaration of legislative will must, of course, come from congress, but the ascertainment of the contingency upon which the act shall take effect may be left to such agencies as it may designate. South Carolina v. Georgia, 93 U. S. 13."

So here congress has created a commission, under the direction of the secretary of war and the supervision of the chief of engineers of the army, to ascertain and determine whether the various hydraulic mines within the territory drained by the Sacramento and San Joaquin river systems can be operated by means of impounding reservoirs and other works without injury to those navigable waters; and, if so, the act of congress permits them to be operated in such a prescribed way as will prevent any such injury. Until the matters of fact committed to the commission have been ascertained, and the extent and methods of the work so prescribed, the act of congress prohibits the operation of any mine by the hydraulic process within the territory drained by the Sacramento and San Joaquin river systems from which any débris matter flows into those waters. This, in my opinion, is the true construction of the act, and to it, as thus construed, I see no constitutional objection. It is too late now for

any one to question the power on the part of congress to declare that débris of any character, or other thing, constitutes an obstruction to the navigable waters within its control, and to prohibit the use of such waters by any such débris or other thing. The power to absolutely prevent the use of such waters for the objectionable purposes necessarily includes the power to prescribe the terms and conditions upon which they may be so used. The provision of section 10 of the act, requiring the surrender to the United States of the right to regulate the manner in which the débris resulting from the working of such mine or mines shall be restrained, and what amount shall be produced therefrom, only constitutes one of the conditions to such use required by congress. As congress already had that power of regulation, it needed no conveyance from the mine owner to vest it. For this reason the insertion of that requirement by congress as a condition to the granting of a permit to mine by the hydraulic process does not render the act obnoxious to any of the objections urged against it.

A decree will be entered for the complainant as prayed for.