## THE STATE *v.* THE OHIO OIL COMPANY.

[No. 18,476.    Filed March 10, 1898.]

INJUNCTION.— *Action by State.—Demurrer.*—To question the capacity of the State to maintain a suit for injunction, a demurrer should embrace the second statutory ground for demurring, to wit:    "That the plaintiff has no legal capacity to sue."    *p. 27.*

STATE.—*Courts Open To.*—The courts of the State and of the United States are open to the State, both in its sovereign capacity and by virtue of its corporate rights.    *pp. 27, 28.*

NATURAL GAS.— *Waste Of.* — *Constitutional Law.* — Section 7510, Burns' R. S. 1894, providing that it shall be unlawful for any person, firm, or corporation operating a natural gas or oil well to permit the flow of gas or oil from such well to escape into the open air, is not unconstitutional as an unwarranted interference with private property, as the title to such gas or oil does not vest in any private owner until it is reduced to actual possession.    *pp. 28-32.*

STATUTORY CONSTRUCTION. — *Scope of Statute.— Preamble.—* If, on review of the whole act, a wider intention than that expressed in the preamble appears to be the real one, effect is to be given to it, notwithstanding the less extensive import of the preamble.    *pp. 32, 33.*

NATURAL GAS.—*Waste Of.—Statute Construed.*—Section 7510, Burns' R. S. 1894, making it unlawful "to permit the flow of gas or oil from any such well into the open air," applies to the waste of gas from wells producing both gas and oil.    *p. 34.*

SAME.—*Waste Of.—Nuisance.—Injunction.*—In a suit by the State to enjoin an oil company from wasting natural gas, the complaint alleged that a large number of the people of the State were almost wholly dependent upon such gas for fuel supply; that the State relying upon the permanent supply of gas, had equipped many public buildings and institutions for the use of natural gas as fuel; that defendant, in the operation of certain wells producing both gas and oil, has permitted large quantities of gas to escape and become wasted, and avows its purpose to continue so to permit the escape of such gas; that the statutory penalties for the wasting of gas are wholly inadequate, and that the wrongful and unlawful conduct of defendant, if suffered to continue, will be irreparable.    *Held,* that the facts stated in the complaint make a case of public nuisance which the State has a right to have abated by injunction.    *pp. 35-46.*

From the Madison Circuit Court.    *Reversed.*

*W. A. Ketcham,* Attorney-General, *Merrill Moores, D. W. Scanlan, M. A. Chipman, S. M. Keltner, E. E.*

*Hendee, F. Winter* and *Blacklidge & Shirley*, for appellant.

*R. R. Stephenson, Geo. Shirts, W. R. Fertig* and *M. F. Elliott*, for appellee.

McCABE, J.—The State of Indiana, by her Attorney-General and the prosecuting attorney of the Madison Circuit Court, brought suit against the appellee, the Ohio Oil Company, seeking to enjoin it from wasting natural gas. The circuit court sustained the defendant's demurrer to the complaint for want of sufficient facts to constitute a cause of action, and the plaintiff, electing to abide said demurrer, and refusing to amend its complaint or to plead further, the court rendered judgment that the plaintiff take nothing by its complaint and that defendant recover costs. Upon this ruling alone the State assigns error.

The substance of the complaint is, that for many years heretofore there has been underlying Madison, Grant, Howard, Delaware, Blackford, Tipton, Hamilton, Wells, and other counties in Indiana, a large deposit of natural gas, utilized for fuel and light by the people of those counties and of many other counties and cities in Indiana, including Indianapolis, Ft. Wayne, Richmond, Logansport, Lafayette and others of the most populous cities of the State, to which cities the gas is conducted, after being brought through wells to the surface of the ground, by pipes and conduits, by means of which many hundreds of thousands of the people of Indiana are supplied with gas for light and fuel. The natural gas underlying the counties named, and other portions of Indiana, is contained in and percolates freely through a stratum of rock known as "Trenton Rock," comprising a vast reservoir in which the gas is confined under great pressure, and from which it escapes, when permitted to do so, with great force. The fuel supplied by the natural gas

thus obtained is the cheapest and best known to civilization, and the value of the natural gas deposit to the State and its citizens is many millions of dollars. Since the discovery of the gas deposit in 1886, vast sums of money have come into the State, and have been invested in building up large manufacturing interests, and vast sums of money belonging to the people of Indiana have been invested in similar enterprises, causing a great increase of population, principally in the territory underlying which gas is found. Many cities in and adjacent to the gas territory, including those named, are almost wholly dependent for fuel supply upon natural gas, and for that reason the people of Indiana have become and are greatly interested in the protection and continued preservation of the gas supply.   Many millions of dollars invested in manufacturing and other properties in and near the gas territory are wholly dependent for their continued operation and for the permanent value of their property upon the gas supply.   Their location and establishment in the gas territory was due to the presence of natural gas underlying it, without which such enterprises could not be operated at a profit, and in the event that the supply of gas is exhausted in the territory, many of such manufacturing enterprises (in which thousands of citizens of Indiana find employment at remunerative wages) will be compelled to suspend operations.   Their employes will be thrown out of employment, and many of them, being wholly dependent upon their labor for support, may and will become charges upon the State and its municipal subdivisions.   The property of the manufacturing enterprises and the vast investments depending on them and related to them will become worthless, and the owners will be driven to remove to other parts of the country, taking away from Indiana great wealth now

invested in these enterprises. In the cities named, and in all the territory known as the "Gas Belt," the inhabitants have for years used practically no other fuel than natural gas. Their houses in many instances, are constructed with a view to the use of natural gas, and will have to be differently equipped before other kinds of fuel can be used. The cost of natural gas as fuel to the people in the gas belt, who number several hundreds of thousands, is very much less than that of any other fuel that has ever been, or can be procured by them, and to the other inhabitants of the State using natural gas it has become and is a source of great convenience, comfort, and increased happiness because of its cheapness, convenience, and cleanliness as fuel. Many small villages in and near the gas territory have within a few years become flourishing and opulent cities. The State's wealth and its revenues derived from taxation on account of such increased population and the various interests that have been fostered and supported by natural gas have been greatly increased, and will, in the event gas is exhausted, be correspondingly curtailed. The State of Indiana, relying upon the permanent supply of gas, has, at great expense, equipped many of its public institutions, including the State-house, the Central and other hospitals for the insane, the asylums for the blind and deaf and dumb, the institution for the care of the orphans of American soldiers and sailors, and other public institutions, owned and maintained by the State of Indiana and its various subdivisions, together with the court-houses in many counties, and a vast number of public schools, for the use of natural gas as fuel, by which the cost of maintaining the public buildings and institutions named has been materially lessened, and the comfort and happiness of their inmates and occupants immensely increased. Natural gas exists

The State *v.* The Ohio Oil Company.

in large reservoirs, or a series of reservoirs connected with each other, underlying the gas territory, and the diminution or consumption of natural gas taken from any part of them affects or reduces correspondingly the common supply.    If the gas supply is accordingly husbanded and protected it will last for many years, and continue to supply the various interests named with abundant fuel, and the population, wealth, and other material interests of the State will continue to be benefited and enhanced, and the comfort, enjoyment, and happiness of the people of the State greatly increased.

It is charged that about May 25, 1897, the Ohio Oil Company, an Ohio corporation, as its name implies, caused a well to be drilled near Alexandria, Madison county, which produces natural gas and petroleum in large quantities.    The location of this well is described, as well as that of five other wells drilled at about the same time as the one first named, all of which produce both natural gas and petroleum, and have done so ever since their completion.    It is charged that, instead of securely anchoring the wells as drilled, so as to confine the gas produced by them within two days next after their completion, the defendant, ever since the completion of the wells, which have been completed for some time, has "unlawfully permitted the gas produced therein to flow and escape into the open air, whereby many millions of cubic feet of natural gas have been wasted and lost, and whereby the State's supply of natural gas has been greatly diminished, and the property of its citizens within the said gas territory dependent upon the continued supply of natural gas for fuel as aforesaid, has been greatly damaged and decreased in value."    It is also charged that the defendant avows its purpose to permit the gas to escape continuously and indefi-

nitely hereafter from said wells, and refuses to make any effort to confine it, and declares its purpose to drill other wells in the gas territory, and permit the gas therefrom to flow and escape into the open air, and that if the gas continues to flow from the wells, the supply of natural gas upon which the citizens of the State depend will be greatly diminished; that the pressure of gas as found in said Trenton rock will be greatly diminished, and that by the diminution of such pressure, water will accumulate in the rock stratum and ultimately and entirely displace and overcome the gas supply; that because of the wrongful acts of the defendant above described, heretofore committed and now continuing, its property and that of its citizens has been and will continue to be essentially interfered with, and the comfortable enjoyment of the lives of its citizens greatly interrupted. And plaintiff avers "that it has no adequate remedy at law for the redress of its grievances complained of; that it is impossible accurately to fix in dollars and cents the damage the plaintiff has sustained and will sustain by reason of the wrongful and unlawful acts of the defendant, if suffered to continue, and that the plaintiff's injuries on account thereof are and will be great and irreparable, and increase as said gas is permitted to flow, and the number of wells wherein the same is unconfined continues to increase; and that the ordinary remedies, though repeatedly resorted to by plaintiff, have proved ineffectual to restrain or check the wrongful action of defendant."

It is charged that the penalties provided by law for the unlawful acts above described are wholly inadequate, and that the defendant has openly defied, and continues to defy, the lawfully constituted authorities of the State in their efforts to enforce and recover in the name of the State the penalties provided by law

The State *v.* The Ohio Oil Company.

for such wrongful acts committed by the defendant, and that injunctive relief is necessary in order to restrain the continued wrongful acts of the defendant, and that, unless the same is given, one of the greatest natural resources of the State will be ultimately destroyed; that, in order to obtain even a partial and inadequate remedy for the wrong done, a multiplicity of suits must be resorted to, entailing great expense, and affording no considerable relief, unless the defendant is restrained and prohibited by injunction from doing the things complained of.

It is therefore prayed that upon final hearing the defendant and its agents, servants, and employes be perpetually enjoined and prohibited from further suffering or permitting the natural gas produced in said wells, or any of them, to escape from them, and that the defendant be ordered and directed forthwith to securely confine the same, either by anchoring each of the wells, or by confining the gas in tanks, pipes or other proper receptacles, and that failing to do so, the sheriff of Madison county be ordered to anchor, secure and confine the natural gas in each of said wells, and that the expense of such anchoring be taxed as part of the costs of suit.

It is intimated by appellee's learned counsel that the State has no right to maintain such a suit, but whether it be on account of lack of capacity to sue, or simply because the complaint does not state facts sufficient, is not made plain by the argument of appellee's counsel. If it was the intention to question the capacity of the State to sue, counsel should have embraced in the demurrer the second statutory ground for demurring, namely: "That the plaintiff has not legal capacity to sue." Section 342, Burns' R. S. 1894 (339, R. S. 1881).

But the courts of the State and United States are

open to the State, both in its sovereign capacity and by virtue of its corporate rights, in both of which characters it sued here. *Indiana* v. *Kentucky*, 136 U. S. 479; *Indiana* v. *Woram*, 6 Hill 33, 40 Am. Dec. 378; *State* v. *Portsmouth Savings Bank*, 106 Ind. 435; *State* v. *Adams Express Co.*, 144 Ind. 549; *Adams Express Co.* v. *Indiana*, 165 U. S. 255; *State* v. *Chicago, etc., R. R. Co.*, 145 Ind. 229; *State* v. *Union Nat'l Bank of Muncie*, 145 Ind. 537; *Western Union Tel. Co.* v. *State*, 146 Ind. 54; 23 Am. & Eng. Ency. of Law, p. 80.

The appellee contends that "the question of the exhaustion of the gas is certain according to the averments in both the injunction cases, and the question, therefore is, who shall be permitted to exhaust it." "The State contends," says appellee, "that the manufacturers and gas companies shall be allowed that privilege for the purpose of bargain and sale, although it incidentally avers benefit to the people, and all this to the exclusion of an oil company which is also using gas for the purpose of a legitimate business. In such matters of private concern the State has no interest and should not have any."

It is true the production of oil is a legitimate business, but the waste and destruction of natural gas, which appellee's demurrer admits it is engaged in, defiantly, constantly, and in utter contempt of the laws of Indiana, and the welfare and comfort of its citizens, is not only not a legitimate business, but has been placed under the ban of two prohibitory statutes in this State. Sections 2316-2318, Burns' R. S. 1894 (Acts 1891, p. 55); section 7510, Burns' R. S. 1894 (Acts 1893, p. 300). Section 1 of the latter act provides: "That it shall be unlawful for any person, firm or corporation having possession or control of any natural gas or oil well, whether as a contractor, owner, lessee,

agent or manager, to allow or permit the flow of gas or oil from any such well to escape into the open air, without being confined within such well or proper pipes, or other safe receptacle for a longer period than two (2) days next after gas or oil shall have been struck in such well. And thereafter all such gas or oil shall be safely and securely confined in such well, pipes or other safe and proper receptacles." The constitutionality of the latter act is assailed by the appellee. But the former act, being very much of the same nature as regards its constitutionality as the latter, was assailed by the appellant in *Townsend* v. *State*, 147 Ind. 624, for every conceivable constitutional objection, and for every objection urged to the act now under consideration, and this court in that case upheld the constitutionality of that act.

It is asserted with great confidence that the gas in or under the appellee's land is a part of the land, and that it is a reasonable use thereof to mine for the oil therein, even though gas is thereby incidentally wasted by permitting its escape into the open air; and that a statute prohibitinig such a reasonable use is unconstitutional. And several Pennsylvania and Ohio cases are cited, together with one from New York, and one in West Virginia, to the effect that petroleum is a mineral, and while it is in the earth it is a part of the realty; and that when it reaches a well, and is produced on the surface, it becomes personal property and belongs to the owner of the well. It is therefore argued that natural gas is likewise a part of the land in or under which it is found, and that the owner of the land may and has a lawful right to assert absolute dominion over all that is found in or under his land, to the center of the earth, and for an unlimited distance upwards from the surface. The force of these authorities depends entirely upon the

analogy between oil or petroleum and natural gas in or under the land. It must be confessed that there is a marked difference between these two substances in their nature. This court has likened natural gas as to its property characteristics to fish in the waters and wild game in the forest before taken and reduced to possession. *Townsend* v. *State, supra,* and cases there cited. But appellee's learned counsel rely on a quotation made by this court in the latter case from the Pennsylvania supreme court, and which had in a gas case been previously quoted by this court. *People's Gas Co.* v. *Tyner,* 131 Ind. 281. That quotation is as follows: "Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals *ferae naturae.* In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their 'fugitive and wandering existence within the limits of a particular tract is uncertain.' * * * They belong to the owner of the land, and are a part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an adjoining, or even a distant owner drills his own land, and taps your gas, so that it comes into his well and under his control, it is no longer yours but his." The part of this quotation that seems favorable to appellee's contention is this: "They [the water, gas, and oil] belong to the owner of the land, and are a part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone." This much of the quotation was not

The State *v.* The Ohio Oil Company.

adopted as law by this court in either of the cases in which the quotation is found.   On the contrary, in the latter case, this court said:  "By the Tyner case, 131 Ind. 281, 282, this court likened natural gas and laws regulating the same to wild animals and laws regulating the taking of such animals.   The supreme court of Minnesota in *State* v. *Rodman,* 58 Minn, 393, 59 N. W. 1098, having under consideration the constitutionality of a certain game law of that state, said:  'We take it to be the correct doctrine in this country that the ownership of wild animals, so far as they are capable of ownership, is in the State, not as proprietor, but in its sovereign capacity as the representative, and for the benefit, of all its people in common.   The preservation of such animals as are adapted to consumption as food, or to any other useful purpose, is a matter of public interest; and it is within the police power of the State, as the representative of the people in their united sovereignty, to enact such laws as will best preserve such game, and secure its beneficial use in the future to the citizens, and to that end it may adopt any reasonable regulations, not only as to time and manner in which such game may be taken and killed, but also by imposing limitations upon the right of property in such game after it has been reduced to possession.' "   And this court in the same case also likened natural gas and its characteristics as property to fish and the laws regulating the taking thereof.   There is no such thing in such laws, either as to wild animals or fish, to the effect that they become the property of the owner of the land on which the animals are found, or in the waters of which the fish are found. And there is no such thing in such laws to the effect that after title has once vested by actual reduction to possession, that the same may wander off and vest in some one else.   To say that the title to natural gas

vests in the owner of the land in or under which it exists to-day, and that to-morrow, having passed into or under the land of an adjoining owner, it thereby becomes his property, is no less absurd and contrary to all the analogies of the law, than to say that wild animals or fowls in "their fugitive and wandering existence," in passing over the land, become the property of the owner of such land, or that fish in their passage up or down a stream of water become the property of each successive owner over whose land the stream passes. It is as unreasonable and untenable as to say that the air and the sunshine which float over the owner's land is a part of the land, and is the property of the owner of the land. We therefore hold that the title to natural gas does not vest in any private owner until it is reduced to actual possession, and therefore that the act from which we have quoted is not violative of the constitution, as an unwarranted interference with private property.

But appellee's counsel contend that a proper construction of the act makes it wholly inapplicable to the subject of this suit, the prevention of the waste of gas. That it does not apply to a well unless it endangers persons or property. It is not in the language of the act that counsel claim to find this meaning, but they claim to find it in the preamble thereto, reading thus: "Whereas, great danger to life and injury to persons and property is liable to result from the improper, unsafe and negligent sinking, maintenance, use and operation of natural gas and oil wells; therefore," etc. It is not claimed, as it cannot with reason be, that the language of the act is either ambiguous or doubtful in its meaning. It is not infrequent for the legislature, in the preamble to a statute, to recite a particular mischief, while the legislative provisions extend far beyond the mischief re-

The Slate *v.* The Ohio Oil Company.

cited. The evil recited is but the motive for legislation, the remedy may both consistently and wisely be extended beyond the cure of that evil; and if, on review of the whole act, a wider intention than that expressed in the preamble appears to be the real one, effect is to be given to it, notwithstanding the less extensive import of the preamble. 23 Am. and Eng. Ency. of Law, 331, 332, and authorities there cited; *Holbrook* v. *Holbrook*, 1 Pick, 251; *Erie, etc., R. R. Co. Casey*, 26 Pa. St. 288; *Yazoo, etc., R. R. Co.* v. *Thomas*, 132 U. S. 174; *Hughes* v. *Done*, 1 Q. B. (1 A. & E. N. S.) 301. In *Yazoo, etc., R. R. Co.* v. *Thomas, supra,* the Supreme Court of the United States said: "The preamble to the act is referred to by counsel, as sustaining their construction, because it is therein declared that the work is one of 'great public importance,' and 'to be encouraged by legislative sanction and liberality' and that 'the physical difficulties of constructing and maintaining railroads to, across, along, or within either the Mississippi, Sunflower, Deer Creek, or Yazoo bottoms or basins, or other alluvial lands herein referred to, are such that no private company has so far been able to establish a railroad and branches, developing said basins and alluvial lands, and connecting them with the railroad systems of the country.' But as the preamble is no part of the act, and cannot enlarge or confer powers nor control the words of the act, unless they are doubtful or ambiguous, the necessity of resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up." We have no doubt, from the language of the act, and the circumstances surrounding its enactment, that the chief object in the passage thereof was to prevent the waste of natural gas. 23 Am. and Eng. Ency. of Law, 335, 336; *Edger*

v. *Board, etc.*, 70 Ind. 331; *Stout* v. *Board, etc.*, 107 Ind. 343; *May* v. *Hoover*, 112 Ind. 455; *Hunt* v. *Lake Shore, etc., R. W. Co.*, 112 Ind. 69.

It is next contended that the act does not apply to appellee's case, because it was intended, as is claimed, to apply only to wells producing oil alone, and to wells producing gas alone, and not to what counsel call combination wells, producing both oil and gas, as is the case with appellee's wells, as disclosed in the complaint. At the time of the passage of the act, the chief waste of natural gas which was going on, and had been for some time, as shown by the Eleventh Annual Report of the United States Geological Survey for 1889-1890, and the current history of the times, resulted from what counsel term combination wells, producing both oil and gas. The waste from wells producing gas alone was small in comparison with that from such combination wells. In the light of these historical facts it would be extremely absurd to suppose that the legislature intended to prevent waste only by closing the spigot and leaving the bung wide open. But even the language of the statute forbids such construction. The act made unlawful, by the express words of the section quoted, is: "to allow or permit the flow of gas or oil from any such well to escape into the open air." In this sentence there is but one well spoken of. The prohibition is against the escape of gas, and it is undeniable that it is equally against the escape of oil, and it is equally clear that the prohibition against the escape of both relates to the same well; and therefore, if they are both permitted to escape from the same well, the permission of the escape of each is made unlawful by the section quoted. Had the statute made the violation thereof a crime, would any rational being contend that an indictment charging the accused with permitting both oil and gas

The State *v.* The Ohio Oil Company.

to escape from such well would not be good? Certainly not.

It is next contended that there is no authority or right of action in the State at common law, and especially that the State cannot maintain a suit in equity, either under the statute or at common law. This being a suit in equity, as the law existed prior to the adoption of the civil code of 1852, if the objection last mentioned be well taken, it is fatal to the complaint. The reason assigned in argument why the State cannot maintain the action for an injunction is that the statute provides a different remedy, namely, the recovery of a penalty of $200.00 for each violation of the act, and a further penalty of $200.00 for each ten days during which such violation shall continue, to be recovered in a civil action in the name of the State, for the use of the county in which such well is located, with attorney's fees and costs of suit. And another remedy provided in another section of the act is that certain persons in the vicinity are authorized to go upon the land where any well is situate from which gas or oil is allowed to escape in violation of the act, and shut up the same, and pack and tube said well so as to prevent the escape of gas or oil, and maintain a civil suit against the owner for the costs of such closing of said well, with attorney's fees and costs of suit. But this court has gone much further than to hold that the fact that the civil remedy given to recover penalties and the other remedies for violation of the act, does not bar the right to an injunction. In the case of the *Peoples Gas Co.* v. *Tyner, supra,* it was said: "No authority has been cited, and we know of none, supporting the position of the appellants that the appellee is not entitled to an injunction because the accumulation of nitroglycerine within the corporate limits of a town or city is

a crime. It has long been settled that a private citizen may maintain an action for a public wrong if he suffers an injury peculiar to himself and not sustained by the public in general." In that case it was held that the extraordinary equitable remedy by injunction could be invoked by a private citizen, even though the act to be enjoined was made a crime by statute. And the same rule was applied in the *Columbian Athletic Club* v. *State, ex rel.*, 143 Ind. 98, where this court said: "Extraordinary emergencies in many cases call for extraordinary remedies. * * * The rule to be observed in such cases is quoted at page 366 from Lord Chancellor Cottenham, 'That it is the duty of the courts of equity (and the same is true of all courts and all institutions) to "adapt its practice and course of proceeding, as far as possible, to the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and not from too strict an adherence to forms and rules established under very different circumstances, decline to administer justice, and to enforce rights for which there is no other remedy."' This rule, the author [Judge Redfield] concludes, is certainly worthy of one of the ablest, wisest, and best judges that ever administered the chancery law of England or America." Our code provides that "whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life and property, is a nuisance, and the subject of an action. * * * The nuisance may be enjoined or abated and damages recovered therefor." Sections 290, 292, Burns' R. S. 1894 (289, 291, R. S. 1881). The facts alleged in the complaint show that the acts of the appellee are such as to essentially interfere with

the comfortable enjoyment of life and the property of the citizens of the State

The supreme court of Kansas, in *State* v. *Crawford,* 28 Kansas, 726, said: "Every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated, is a public nuisance." The demurrer to the complaint admits that the wells of the appellee are in this category.

The supreme court of California, in a suit by the attorney-general to enjoin the Truckee Lumber Company from discharging sawdust into the Truckee River with the effect of destroying the fish therein, in sustaining the action, which is closely analogous to this action, the court used the following language, which we adopt: "It is alleged that the acts of defendant have the effect of polluting and poisoning the waters of the river, and thereby killing and destroying the fish therein. Anything which is 'an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life and property by an entire community or neighborhood, or any considerable number of persons,' is a public nuisance. The fish within our waters constitute the most important constituent of that species of property commonly designated as wild game, the general right and ownership of which is in the people of the State (*Ex parte Maier,* 103 Cal. 476, 37 Pac. 402, 42 Am. St. 129), as in England it was in the king; and the right and power to protect and preserve such property for the common use and benefit is one of the recognized prerogatives of the sovereign, coming to us from the common law, and preserved and expressly provided for by the statutes of this and every other state of the Union. The complaint shows that by the repeated and continuing acts of defendant this public property right is being and will continue to be greatly interfered with and

impaired; and that such acts constitute a nuisance, both under our statute and at common law, is not open to serious question. (*People* v. *Elk River, etc., Co.,* 107 Cal. 219, 40 Pac. 486, 48 Am. St. 121.)　*　*　*

"The dominion of the State, for the purpose of protecting its sovereign rights in the fish within its waters, and their preservation for the common enjoyment of its citizens, is not confined within the narrow limits suggested by the defendant's argument. It is not restricted to their protection only when found within what may in strictness be held to be navigable or otherwise public waters. It extends to all waters within the state, public or private, wherein these animals are habited or accustomed to resort for spawning or other purposes, and through which they have freedom of passage to and from the public fishing grounds of the state.　*　*　*　.

"While the right of fishery upon his own land is exclusively in the riparian proprietor, this does not imply or carry the right to destroy what he does not take. He does not own the fish in the stream. His right of property attaches only to those he reduces to actual possession, and he cannot lawfully kill or obstruct the free passage of those not taken.　*　*　*

"The fact that acts of the character alleged are by the penal code made a misdemeanor, and punishable as such, does not make them less a nuisance, nor imply that the legislature intended to make the criminal remedy exclusive of the civil. Nor is there anything in the objection that the attorney-general is not privileged to maintain the action upon his own information, without the intervention of a private relator." *People* v. *Truckee Lumber Co.,* 116 Cal. 397, 48 Pac. 374. The same doctrine is laid down in *People* v. *City of St. Louis,,* 10 Ill. 351; *Commonwealth* v. *Pittsburgh, etc., R. R. Co.,* 24 Pa. St. 159; *State* v. *Metschan* (Or.), 46 Pac.

The State *v.* The Ohio Oil Company.

791.   In *Commonwealth* v. *Pittsburgh, etc., R. R. Co.,* *supra,* it was said: "The matter complained of is an invasion of a public highway, and it must be enjoined against.   The defendants are not allowed the excuse that this part of the canal is practically abandoned; for no neglect is chargeable against the state; its officers are insisting on its rights, and it is the merest effrontery in the defendants to set up their views of the need of the canal against the state which thought fit to make it, and against the public officers who are entrusted with its custody.   *   *   *   It is therefore ordered that an injunction issue."

The state of South Carolina brought suit in one of its courts to enjoin the Coosaw Mining Company from digging, mining or removing phosphate rock and phosphatic deposits from the bed of the river.   On petition of the Mining Company the case was removed into the circuit court of the United States.   From the decree of that court the Mining Company appealed to the Supreme Court of the United States.   That court, in affirming the judgment of the circuit court, awarding an injunction, said: "An instructive case upon this subject is *Attorney-General* v. *Jamaica Pond Aqueduct,* 133 Mass. 361, 364.   That was an information in equity, in the name of the Attorney-General, to restrain a corporation from doing certain illegal acts, the necessary effects of which would be not only to impair the rights of the public in the use of one of the great ponds of Massachusetts for the purposes of fishing and boating, but to create a nuisance by lowering the pond and exposing upon its shores slime, mud, and offensive vegetation detrimental to the public health.   It was held, upon the authority of numerous cases, American and English, that where the nuisance is a public one, an information by the Attorney-General was the appropriate remedy.   After ob-

serving that the preventive force of a decree in equity, restraining the illegal acts before any mischief was done, would give a more efficacious and complete remedy than an indictment, or proceeding under a statute for the abatement of the nuisance, the court said: 'There is another ground upon which, in our opinion, this information can be maintained, though perhaps it belongs to the same general head of equity jurisdiction of restraining and preventing nuisances. The great ponds of the Commonwealth belong to the public, and, like the tide water and navigable streams, are under the control and care of the Commonwealth. The rights of fishing, boating, bathing and other like rights which pertain to the public are regarded as valuable rights, entitled to the protection of the government. * * * If a corporation or an individual is found to be doing acts without right, the necessary effect of which is to destroy or impair these rights and privileges, it furnishes a proper case for an information by the Attorney-General to restrain and prevent the mischief.' So, in Eden on Injunctions: 'The usual, and perhaps the more correct mode of proceeding in equity in cases of public nuisance is by information at the suit of the Attorney-General,' p. 267. Mr. Justice Story said that an information in equity at the suit of the Attorney-General would lie in cases of purpresture and public nuisance, the jurisdiction of courts of equity being sustained because of 'their ability to give a more complete and perfect remedy than is attainable at law in order to prevent irreparable mischief, and also to suppress oppressive and vexatious legislations.' Eq. Jur., sections 922, 923, 924; *People* v. *Vanderbilt*, 26 N. Y. 287; *District Attorney* v. *Lynn, etc., R. R. Co.*, 16 Gray 242, 245; Kerr on Injunctions, 262, 263; 1 Joyce on Injunctions, 120.

"These principles are applicable to the present case. The remedy at law for the protection of the State in respect to the phosphate rocks and phosphatic deposits in the beds of its navigable waters is not so efficacious or complete as a perpetual injunction against interference with its rights by digging, mining, and removing such rocks and deposits without its consent. The Coosaw Mining Company, unless restrained, will not only appropriate to its use property held in trust for the public, but will prevent the proper administration of that trust, for an indefinite period, by obstructing others, acting under lawful authority, from enjoying rights in respect to that property derived from the State. These conflicting claims cannot be so effectively or conclusively settled by proceedings at law, as by a comprehensive decree covering all the matters in controversy. Proceedings at law or by indictment can only reach past or present wrongs done by the appellant, and will not adequately protect the public interests in the future. What the public are entitled to have is security for all time against illegal interference with the control by the State of the digging, mining and removing of phosphate rock and phosphatic deposits in the bed of the Coosaw River. Such security was properly given by the decree below. Decree affirmed." *Coosaw Mining Co.* v. *South Carolina,* 144 U. S. 566.

Accordingly, in *Cranford* v. *Tyrrell,* 128 N. Y. 344, 28 N. E. 515, it was held: "That the perpetrator of the nuisance is amenable to the provisions and penalties of the criminal law is not an answer to an action against him by a private person to recover for injury sustained, and for an injunction against the continued use of his premises in such a manner." And in *Port of Mobile* v. *Louisville, etc., R. R. Co.,* 84 Ala. 115, 126, 4 South. 106, it was held that: "The mere fact that an

act is criminal does not divest the jurisdiction of equity to prevent it by injunction, if it be also a violation of property rights, and the party aggrieved has no other adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights."

It has been held that the United States in its sovereign capacity may enjoin hydraulic mining to the detriment of navigable streams. *United States* v. *North Bloomfield Gravel Mining Co.*, 81 Fed. 243. In a case where the state officers failed to enforce the law against brokerage in railroad tickets, the railroads brought suit in the circuit court of the United States to enjoin the brokerage business as unlawful. The circuit court of the United States for the middle district of Tennessee granted an injunction, and in answering the objection that such a proceeding was novel and unprecedented, said: "I return now to the argument based on the ground that this is a novel application of the injunction, not sanctioned by previous precedent directly in point. This argument, carried to its full logical result, would have prevented the enunciation of the first equitable principle and the establishment of the first equitable precedent for the preventive remedy. It is indeed, an age-worn argument. It has been employed from the beginning of equity jurisprudence as a part of the objection to the extension of the equitable remedy to new conditions and new cases. This is the well known history of the subject. Of course, this contention has been overruled, and precedent after precedent established from time to time to meet new conditions and to do full justice, until the argument has long since lost most of its force, although it is still maintained in form. It has been in answer to arguments like this that the

The State v. The Ohio Oil Company.

great chancellors have stated time and again that they decline to lay down any definite rules as to when a court of equity will interpose by injunction. In fact, to do so would at once put a limit to all progress in equitable jurisprudence. The most that has been said is that in the use of the writ of injunction the court exercises sound discretion regulated by analogy, by what would be manifestly just in view of all existing conditions, and requiring as a condition that there is no adequate remedy at law. Beyond this the courts have not gone, in the way of placing a limit on their power. It must be recognized that jurisprudence, both legal and equitable, both in respect to the right and the remedy, is progressive, that it is expansive, and that, while its great principles remain good for one time as well as another, these principles must be extended to new conditions, and this involves an extension of the remedy, and often a change in the form of the remedy. Making the injunction mandatory as well as preventive is an example of such a change. Any system of jurisprudence coming short of this would fail to meet the demands of civilization. A similar objection that novel use was being made of the writ of injunction was pressed in the case of *Toledo, A. A. & N. M. R. W. Co.* v. *Pennsylvania Co.*, 54 Fed. 751, and was answered by the court as follows: 'Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. If based on sound principles, and beneficial results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief. Mr. Justice Brewer, sitting in the Circuit

Court for Nebraska, said: "I believe most thoroughly
that the powers of a court of equity are as vast, and its
processes and procedure as elastic, as all the chang-
ing emergencies of increasingly complex business re-
lations and the protection of rights can demand." Mr.
Justice Blatchford, speaking for the Supreme Court,
in *Joy* v. *St. Louis,* 138 U. S. 1, 11 Sup. Ct. 243, said:
"It is one of the most useful functions of a court of
equity that its methods of procedure are capable of
being made such as to accommodate themselves to the
development of the interests of the public in the
progress of trade and traffic by new methods of in-
tercourse and transportation." '" *Nashville, etc., R.
W. Co.* v. *M'Connell,* 82 Fed. 76. To the same effect is
our own case of *Columbian Atheltic Club* v. *State, ex rel.,
supra.*

It is true that as a result of the principles an-
nounced in the previous part of this opinion, natural
gas, when reduced to actual possession of the land-
owner, when drawn into his well, pipes, tanks, or other
receptacles thereby becomes his personal property,
subject to his dominion. But, as said by this court in
*Peoples Gas Co.* v. *Tyner, supra:* "The rule that the
owner has the right to do as he pleases with or upon
his own property is subject to many limitations and
restrictions, one of which is that he must have due
regard for the rights of others."

Appellee's counsel have conceded that the pressure
in gas wells since the discovery of gas in this State
has fallen from 350 pounds to 150 pounds. This
very strongly indicates the possibility, if not the prob-
ability, of exhaustion. In the light of these facts, one
who recklessly, defiantly, persistently, and continu-
ously wastes natural gas, and boldly declares his pur-
pose to continue to do so, as the complaint charges
appellee with doing, all of which it admits to be

The State *v.* The Ohio Oil Company.

true by its demurrer, ought not to complain of being branded as the enemy of mankind. But appellee tries to excuse its conduct on the score that it cannot mine and utilize oil under and in its land without wasting the gas. But there is nothing in the record to bear out that claim. [However, if there was, it would not furnish a valid excuse. It is not the use of unlimited quantities of gas that is prohibited, but it is the waste of it that is forbidden. The object and policy if that inhibition is to prevent, if possible, the exhaustion of the storehouse of nature, wherein is deposited an element that ministers more to the comfort, happiness, and well-being of society than any other of the bounties of the earth. Even if the appellee cannot draw oil from its well without wasting gas, it is not denied that it may draw gas therefrom, and utilize it without wasting the oil. But, even if it can not draw oil from such wells without wasting gas, and is forbidden by injunction so to do, it is only applying the doctrine that the owner must so use his own property as not to injure others. It may use its wells to produce gas for a legitimate use, and must so use them as not to injure others or the community at large. The continued waste and exhaustion of the natural gas of Indiana through appellee's wells would not only deny to the inhabitants the many vaulable uses of the gas, but the State, whose many *quasi* public corporations have many millions of dollars invested in supplying gas to the State and its inhabitants, will suffer the destruction of such corporations, the loss of such investments and a source of large revenues. To use appellee's wells as they have been doing, they injure thousands and perhaps millions of the people of Indiana, and the injury, the exhaustion of natural gas, is not only an irreparable one, but it will be a great public calamity. The oil appellee produces is of

very small consequence as compared with that calamity which it mercilessly and cruelly holds over the heads of the people of Indiana, and, in effect, says: "It is my property, to do as I please with, even to the destruction of one of the greatest interests the State has, and you people of Indiana help yourselves if you can. What are you going to do about it?"

We had petroleum oil for more than a third of a century before its discovery in this State, imported from other states, and we could continue to do so if the production of oil should cease in this State. But we cannot have the blessings of natural gas unless the measures for the preservation thereof in this State are enforced against the lawless. We therefore conclude that the facts stated in the complaint make a case of a public nuisance which the appellant has a right to have abated by injunction, and that the complaint states facts sufficient to constitute a cause of action. Hence, the circuit court erred in sustaining appellee's demurrer to the complaint. The judgment is reversed, and the cause remanded, with instructions to overrule said demurrer, and require the defendant to answer the complaint, and for further proceedings in accordance with this opinion.