TOLLESTON CLUB OF CHICAGO ET AL. *v.* CARSON.

[No. 22,692. Filed April 24, 1919. Rehearing denied December 16, 1919.]

1. QUIETING TITLE.—*Right to Relief.*—In suits to quiet title the plaintiff must recover, if at all, on the strength of his own title. p. 651.

2. WATERS AND WATERCOURSES.—*Swamp Lands and Lakes.*— *Boundaries.*—*Meander Lines.*—Where a conveyance describes lands bordering on nonnavigable waters such as lakes or swamps of circular or irregular form, the doctrine of riparian ownership, which applies to conveyances of lands bounded by nonnavigable streams, has no application, but the submerged land is treated as surveyed and the lines of the survey of the border lot, unless otherwise indicated, are regarded as protracted across the water so as to include, as *part of the grant* thereof, the title to the submerged land to the limits of the subdivision within the lines so protracted, even though the title of the abutting owner is extended beyond the center of the water or to the opposite shore. pp. 653, 654.

3. COURTS.—*Stare Decisis.*—*Boundaries.*—The rule that a conveyance of land bounded by a lake or swamp of circular or irregular form carries title to submerged land within the limits of the subdivision described in the conveyance, though open to criticism, will be followed under the doctrine of *stare decisis.* p. 655.

4. WATERS AND WATERCOURSES.—*Boundaries.*—*Intention of Parties.*—Where it is apparent that the parties to a conveyance to land adjoining nonnavigable waters intended the meander line as a boundary limiting the extent of the grant, the intention of the parties will control. p. 657.

5. PUBLIC LANDS.—*Title Under Patent.*—*Meander Lines.*—A grant by the state of land under the act of 1852 (1 R. S. 1852 p. 471), providing for the sale and reclamation of swamp lands, conveys only the surveyed portion above the meander line, since a grant of public land, being purely statutory, must be construed with reference to the statute under which it is made.

(*Tolleston Club, etc.,* v. *State,* 141 Ind. 197, distinguished and overruled in part.)    pp. 657, 658.

From the Porter Superior Court; *Harry B. Tuthill,* Judge.

Action by Isabella Carson against the Tolleston Club of Chicago, Amos W. Walker and others.    From a judgment for the plaintiff, the named defendants appeal. *Reversed.*

*Randall W. Burns, John H. Gillett, Gerald A. Gillett, Fred Barnett,* for appellants.

*Peter Crumpacker, Fred C. Crumpacker* and *Charles T. Crumpacker,* for appellee.

LAIRY, J.—Appellee, Isabella Carson, brought this action against appellants, the Tolleston Club of Chicago, Amos W. Walker, and many others, the purpose being to quiet her title to certain lands described by metes and bounds in section 17, township 36 north, range 8 west, in Lake county, Indiana.    All of the defendants defaulted except the Tolleston Club and Walker.    A trial on the issues formed resulted in a verdict and judgment, to reverse which this appeal is prosecuted.

In order to convey a clear understanding of the questions involved it is necessary to make a statement showing the source of the conflicting claims of title.

In 1834 and 1835 the government of the United States caused a survey of township 36 north, range 8 west, in the State of Indiana.    The Calumet river flows across the township from east to west a little north of the center.    At the time of the survey there was a marsh on both sides of the current, a large part of which was covered by water and which was designated on the plat as an "impassable morass."    The plat of the survey shows meander lines run on both sides of the river bordering the "impassable morass," the distances between the meander lines in sections 17 and 20 being over one

mile. Outside the meander lines the section lines, both north and south and east and west, are shown on the plat by solid black lines, and the subdivision of the sections into quarters is shown by similar lines. The north and south section lines are shown on the plat by dotted lines extending across the "impassable morass" between the meander lines, but the east and west section lines which would lie between the meander lines are not shown. A large part of the south half of section 17 in which the land in controversy lies is south of the north meander line. The plat shows that the part of section 17 lying north of the meander line was subdivided. The north half of the northeast quarter and the north half of the northwest quarter are shown as 80-acre tracts, and the southwest quarter of the northwest quarter is shown as a 40-acre tract. The southeast quarter of the northeast quarter and that part of the northeast quarter of the southeast quarter lying north of the meander line was indicated on the plat as lot 1, containing sixty-eight acres. The southwest quarter of the northeast quarter and that part of the northwest quarter of the southeast quarter lying north of the meander line was indicated on the plat as lot 2, containing 61.30 acres. The southeast quarter of the northwest quarter and that part of the northeast quarter of the southwest quarter lying north of the meander line was indicated in the plat as lot 3, containing sixty-two acres. The parts of the northwest quarter of the southwest quarter and the southwest quarter of the southwest quarter lying north of the meander line constitutes lot 4, as indicated on the plat. A copy of the map of the government survey, covering section 17 and other sections contiguous to the marsh is set out for reference. See pages 645, 648.

The State of Indiana acquired title to all or a part of said section 17 under an act of Congress approved Sep-

tember 28, 1850, known as the Swamp Land Act.    The
patent evidencing such grant is as follows:

"Whereas, by the act of Congress approved Sep-
tember 28, 1850, entitled 'An act to enable the state
of Arkansas and other states to reclaim the swamp
lands within their limits,' it is provided that all the
swamp and overflowed lands, made unfit thereby
for cultivation within the State of Indiana, which
remained unsold at the passage of said act, shall
be granted to said state; and, whereas, in pursuance
of instructions from the General Land Office of the
United States, the several tracts or parcels of land
hereinafter described have been selected as swamp
and overflowed lands, inuring to the said state,
under the act aforesaid, being situate in the district
of lands subject to sale at Winamac, Indiana, to
wit:  Whole of sections two, three, six, seven, eight,
nine, ten and eleven.   The whole of fractional sec-
tions twelve, fifteen, seventeen, eighteen, nineteen,
twenty, twenty-one and twenty-two (here follows
the description of many additional tracts of lands
not included in this controversy) all in township
tnirty-six north of range eight west, containing in
all eleven thousand, three hundred and three acres,
and thirty-nine hundredths of an acre, according to
the official plats of survey of the lands returned to
the General Land Office, by the Surveyor General,
and for which the Governor of the said state of In-
diana, did on the eighteenth day of December, one
thousand, eight hundred and fifty-two request a
patent to be issued to the said state, as required in
the aforesaid act.  ·
"Now, therefore, know ye, that the United States of
America, in consideration of the premises, and in
conformity with the act of Congress, have given
and granted, and by these presents do give and
grant, unto the said state of Indiana, in fee simple
subject to the disposal of the Legislature thereof,
the tracts of land above described, to have and to
hold the same, together with all the rights, privil-
eges, immunities and appurtenances thereto belong-
ing, unto the said state of Indiana, in fee simple and
to its assigns forever."

In 1856 the State of Indiana granted to Aaron N.

Hart, by separate patents, the following described tracts of land in said section 17, to wit:    The northwest quarter of the northwest quarter; the southwest quarter of the northwest quarter; lot 2 in said section containing 61.30 acres; lot 3 in said section containing sixty-two acres; and lot 4 in said section containing 37.70 acres. Appellee claims the land in controversy under a deed to parts of lot 2 and lot 3, tracing her chain of title through mesne conveyances to Aaron N. Hart.

In 1870 the Congress of the United States passed an act which, after reciting by way of preamble that there was at the time lying along the banks of the Little Calumet river in the counties of Porter and Lake in the State of Indiana a body of lands supposed to contain about 4,000 acres, which had never been sold or surveyed and which was described in the original government survey as an impassable morass, and after further reciting in the preamble that the Calumet Drainage Company had been organized under the laws of the State of Indiana for the purpose of draining the valley of said river, including the impassable morass, provided that said unsold land should be subject to a lien under the laws of Indiana for the proper proportion of the costs of such drainage, and further provided by §2 of the act that said lands might be surveyed and sold to the highest bidder under the directions of the Secretary of the Interior subject to such lien.

In 1872 the United States government caused the lands lying between the meander lines in township 36 north, range 8 west, to be surveyed for the purpose of sale under the provisions of the act to which reference has been made.    That part of the south one-half of section 17 lying south of the meander line was mostly included in lot 5 and lot 6 as shown by the plat of this survey, a copy of which is set out for reference.

Tolleston Club, etc. *v.* Carson—188 Ind. 642.

The Tolleston Club claims title to the lands in contro-
versy lying south of the north meander line, basing its
claim on deeds under a chain of title originating in
patents issued by the government of the United States
under the last survey.

The tract of land in controversy is described by metes
and bounds as follows:   Beginning at a point in the
middle of the north line of lot 2 in said section; thence
south on a line parallel with the north and south middle
line of said section to the south line thereof; thence
west to said north and south center line of said section;
thence north along said center line to the northwest
corner of said lot 2; thence east to the place of begin-
ning.   Also, commencing at a point 591.1 feet east of
the southwest corner of the northeast quarter of the
northwest quarter of said section; running thence east
to the northeast corner of lot 3 as surveyed and desig-
nated by the United States government in said section;
thence south along the east line of said lot 3 to the
south line of said section 17; thence west along said
south line to a point due south of the place of beginning;
thence north to the place of beginning.

Appellee claims title to the land south of the meander
line on the theory that the entire section was covered by
the original government survey of 1834, and that no
part of the section was excluded or left unsurveyed; that
the title of the United States government passed to the
State of Indiana under the patent heretofore set out,
and that the sale of lot 2 and lot 3 by the state to Aaron
N. Hart conveyed not only the high land north of the
meander line, but also the submerged land lying south
thereof within the subdivision of the section.

The Tolleston Club makes no claim to the land de-
scribed north of the meander line; but, as to that part
of the land south of the meander line included in the
description, it asserts title on two grounds:   First, it

claims a record title to the lots laid off by the government in 1872, within the meander lines through a chain of conveyances extending back to the United States government; and, second, it claims title by adverse possession under color of title for more than twenty years.

The title claimed by appellant Walker is based on a quitclaim deed dated in 1896 by which James Carson and Isabella Carson, his wife, conveys to Amos W. Walker—

> "all interest in the following described real estate to wit: An undivided interest amounting to Five (5) acres in the North Half (N½) of the Northwest Quarter (N. W.¼) and the Southwest Quarter (S. W.¼) of the Northwest Quarter (N. W.¼) and Lot Three (3) and Four (4) and the West Thirty (W. 30) and Thirty One-hundredths (30/100) acres of Lot Number Two (2) all in Section Seventeen (17), Township Thirty-six (36) North, Range Eight (8) situated in the county of Lake in the State of Indiana."

James Carson was at the time of the conveyance the owner of an undivided interest in the land described as a tenant in common with others, and appellant Walker claims that under the description contained in the deed all of the interest of James Carson in the lands described therein passed to him, and that the lands subsequently set off to Carson in severalty under the partition proceeding, which was pending at the date of the deed, vested in him under and by virtue of said conveyance. He asserts that the subsequent conveyance from James Carson to Isabella Carson conveyed no title to the real estate in controversy, and that he owns the same in fee simple. He also bases a claim to the land on a tax deed. In the trial court, appellant Walker sought affirmative relief by cross-complaints asking that his title be quieted.

It is thus seen that appellant Walker and appellee, Isabella Carson, both derive title from the same source, the controversy between them arising over the construction of the quitclaim deed executed by James Carson and wife to Walker. Appellant Tolleston Club claims that part of the land described lying south of the north meander line as against both Isabella Carson and appellant Walker.

In suits to quiet title the plaintiff must recover, if at all, on the strength of his own title. The evidence must show title in the plaintiff; it is not sufficient

1. that it shows that the adverse claimant is without title. *Brady* v. *Gregory* (1911), 49 Ind. App. 355, 358, 97 N. E. 452; *Howard* v. *Twibell* (1913), 179 Ind. 67, 69, 100 N. E. 372, Ann. Cas. 1915C 93. If Isabella Carson has a record title to that part of land described lying south of the meander line, such title is derived through a grant from the State of Indiana covering that part of the land described. Appellant Tolleston Club asserts that the state, at the time of such grant, had no title to the land in section 17, lying south of the north meander line, for the reason, as asserted, that the land between the meander lines shown on the plat made by the government was not surveyed and did not pass from the United States government to the state under the swamp land grant and the patent made thereunder. It is not controverted, however, that the title to lots 2 and 3 lying north of the meander line and containing, respectively, 61.30 acres and sixty-two acres passed to the state under the swamp land grant whether the land in section 17 south of the meander line passed by such grant or not. If it be held that the grant made by the state to the remote grantor of appellee, Isabella Carson, for lots 2 and 3 as shown on the government plat included only the land within the lines bounding those lots as indicated on the plat, and that the meander line

marked the southern boundary of such grants, it will then be apparent that so far as the title of appellee is concerned, it can make no difference whether the title to the land south of the meander line in section 17 passed to the state under the swamp land grant or whether it remained in the United States government.

Appellee asserts that the meander line as shown on the plat of the government survey was not the southern boundary line of lots 2 and 3 and that it was intended only as a line separating the salable land within the lot from that which was unsalable south of the meander line of the subdivision of which the lot formed a part. It is asserted that when the salable land north of the meander line was sold and granted by the state, the patent carried the title to the submerged land beyond the meander line to the limits of the subdivision. As sustaining this position appellee relies on numerous cases decided by this court. *Stoner* v. *Rice* (1889), 121 Ind. 51, 22 N. E. 968, 6 L. R. A. 387; *Brophy* v. *Richeson* (1894), 137 Ind. 114, 36 N. E. 424; *Tolleston Club, etc.* v. *State* (1895), 141 Ind. 197, 38 N. E. 214, 40 N. E. 690; *Kean* v. *Roby* (1896), 145 Ind. 221, 42 N. E. 1011; *Tolleston Club, etc.* v. *Clough* (1896), 146 Ind. 93, 43 N. E. 647; *Mason* v. *Calumet Canal, etc., Co.* (1898), 150 Ind. 699, 50 N. E. 85; *Gary Land Co.* v. *Griesel* (1912), 179 Ind. 204, 100 N. E. 673.

The cases in this state prior to *Stoner* v. *Rice, supra,* are not entirely consistent with each other, and some of those cases cannot be reconciled with the cases following *Stoner* v. *Rice, supra.* The case of *Ross* v. *Faust* (1876), 54 Ind. 471, 23 Am. St. 655, was an action of trespass against the defendant for removing gravel from the bed of White river, the plaintiff being the owner of a lot of land on the bank. In making the survey the government surveyor indicated a meander line on the bank of the river following the sinuosities there-

of, and it was held that such line did not mark the limit of the grant. It was further held that the stream was the boundary, and that, being nonnavigable, the title of plaintiff extended beyond the meander line on the bank to the thread of the current. The decision in this case was based on the riparian rights of the plaintiff, and it has been followed consistently by all of the later cases in this state which involves the strict application of the doctrine of riparian ownership. *Sphung* v. *Moore* (1889), 120 Ind. 352, 22 N. E. 319; *Sizor* v. *City of Logansport* (1898), 151 Ind. 626, 50 N. E. 377, 44 L. R. A. 814; *Leonard* v. *Wood* (1903), 33 Ind. App. 83, 70 N. E. 827; *Illyes* v. *White River Light, etc., Co.* (1910), 175 Ind. 118, 93 N. E. 670.

Where the meander line borders the banks of a river or other narrow body of water the rule stated in *Ross* v. *Faust, supra,* can generally be applied without 2. difficulty; but where it borders a large lake or swamp of a circular or irregular form the application of the rule is not so simple, and, in disposing of cases in which such conditions were presented, the court encountered difficulties, as appears from the decisions hereafter cited in this opinion. In cases where it appeared that lakes or other nonnavigable waters of circular or irregular shapes were meandered, and bordering lots on all sides were owned by different persons, it became manifest that the title of each adjoining proprietor could not extend to the center of the body of water without overlapping. When such a condition was encountered it was first held that title of the owner of the border lot extended to the middle of the lake if within the boundary of the subdivision of which the lot formed a part. *Ridgway* v. *Ludlow* (1877), 58 Ind. 248. In *State* v. *Portsmouth Savings Bank* (1886), 106 Ind. 435, 7 N. E. 379, it was held that the owners of rim lots bordering on a lake could not claim title be-

yond the limits of the subdivisions of which the lots were a part. In these cases the title of the owner of the border lot to lands beyond the meander line or under the body of water seems to be based on the doctrine of riparian ownership, with the limitation that the title of the riparian owner could not extend beyond the limits of the subdivision of which the border lot formed a part.

The only case decided prior to *Stoner* v. *Rice, supra,* which is not in line with the foregoing decisions, is that of *Edwards* v. *Ogle* (1881), 76 Ind. 302. Under the facts peculiar to that case, the court held that the owner of the border lot, laid off by the Squibbs survey, took only to the meander line.

The case of *Stoner* v. *Rice, supra,* is a departure from the earlier cases, and the decision rests on a basis entirely different. The doctrine of riparian ownership is abandoned. The land lying under the body of water is treated as surveyed, and the lines of the survey are regarded as being protracted across the water so as to fill out the subdivisions lying on the bank. Unless otherwise indicated, the grant of a border lot carries with it, *as a part of the grant,* the title to the submerged land to the limits of the subdivision within the lines so protracted. Under this rule as developed by later decisions, the title of an abutting owner may extend beyond the center of the water, and may even include land on the opposite side. *Gary Land Co.* v. *Griesel, supra.*

The case of *Stoner* v. *Rice, supra,* was criticized in the case of *Hardin* v. *Jordan* (1891), 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428, on the ground that it is in conflict with the common law of England as recognized and adopted in the other states of the Union. The same case is again discussed in the dissenting opinion of Justices White and McKenna in the case of *Kean* v. *Calumet Canal Co.* (1902), 190 U. S. 452, 488, 23 Sup.

Ct. 651, 47 L. Ed. 1134, where it is said that the Indiana court evidently adopted the rule announced in *Clute* v. *Fisher* (1887), 65 Mich. 48, 31 N. W. 614, which case followed two earlier decisions of the Supreme Court of Michigan. *Wilson* v. *Hoffman* (1884), 54 Mich. 246, 20 N. W. 37, and *Keyser* v. *Sutherland* (1886), 59 Mich. 455, 26 N. W. 865. It is then pointed out that the cases last cited were based on the authority of *Brown's Lessee* v. *Clements* (1845), 3 How. 650, 11 L. Ed. 767, which case had been expressly overruled by the Supreme Court of the United States long prior to the decision of *Clute* v. *Fisher, supra*. *Gazzum* v. *Phillips' Lessee* (1857), 20 How. 372, 15 L. Ed. 958.

The soundness of the rule adopted in *Stoner* v. *Rice, supra*, and followed in the later decisions of this state may be open to serious doubt. It is not necessary for the court to express its approval or dissatisfaction with the rule adopted, or to intimate

3.

what the decision would be were the question a new one. The rule has stood and has been followed in this state for many years, and it has been recognized in the prevailing opinion in the case of *Kean* v. *Calumet Canal Co., supra*. No doubt many titles have passed on the faith of the rule, and the doctrine of *stare decisis* requires us to adhere to it now whether right or wrong. To change the rule now would unsettle titles and would result in greater harm than good. The court feels impelled to adhere to the rule adopted in *Stoner* v. *Rice, supra*, and followed by the later decisions for the reason that it has become a rule affecting the title to real estate in this state.

Appellants assert that this rule cannot be applied in construing the grant from the United States to the State of Indiana for the reason that the construction of a grant purporting to convey lands owned by the general government presents a federal question, and that the

extent of such grant and the question as to whether certain lands passed thereby, when presented either in a state or federal court, must be determined in accordance with the common law as announced by the Supreme Court of the United States, and cannot be decided in accordance with any local state law. As supporting this proposition the recent cases of *Chapman & Dewey* v. *St. Francis* (1913), 232 U. S. 186, 34 Sup. Ct. 297, 58 L. Ed. 564, and *Producers Oil Co.* v. *Hanzen* (1915), 238 U. S. 325, 35 Sup. Ct. 755, 59 L. Ed. 1330, are cited, together with numerous other decisions to the same effect. As opposed to the proposition the cases of *Hardin* v. *Jordan, supra; Mitchell* v. *Smale* (1891), 140 U. S. 406, 11 Sup. Ct. 819, 840, 35 L. Ed. 442, and *Kean* v. *Calumet Canal Co., supra,* are cited. In the case last cited a judgment of the Supreme Court of this state based on the rule announced in *Stoner* v. *Rice, supra,* was affirmed, and the prevailing opinion recognizes and applies that rule, because, as stated by the court, the local law of Indiana and the common law as understood by the court were the same so far as the case before the court was concerned, citing *Stoner* v. *Rice, supra,* and *Hardin* v. *Jordan, supra.* This court is not required, in the case before it, to decide the questions thus raised. In view of the conclusion reached it is not necessary to decide whether the question is one to be determined in accordance with the local law of the state or by an application of the rules of decisions announced by the Supreme Court of the United States. This case can be disposed of without deciding whether the land between the meander line shown on the plat of the government survey did or did not pass to the state under the swamp land grant. In the discussion following, the court assumes that the title to that land did pass to the state without so deciding.

The rule in *Stoner* v. *Rice, supra,* applies without

doubt to the construction of the grant made by the State of Indiana to the remote grantor of appellee; 4. but the rule with which we are dealing does not apply where it is apparent that the intention of the parties to the conveyance was to treat the meander line as a boundary limiting the extent of the grant. The application of this rule to the grants of lots 2 and 3 made by the State of Indiana to the remote grantor of appellee requires the court to hold that such grants included the submerged land south of the meander line within the side lines of those lots as extended to the south line of the subdivision, unless there is something in the form of the grants or in the statute under the authority of which they were made which indicates an intention to limit the grant to the number of acres north of the meander line and extending thereto as the boundary.

The lands in question were sold by the state under the authority of an act of the legislature, entitled, "An Act to regulate the sale of swamp lands donated by the United States to the State of Indiana, and to provide for the drainage and reclamation thereof in accord with the conditions of said grant." 1 R. S. 1852 p. 471.

In the recent decision of *State* v. *Tuesburg Land Co.* (1915), 61 Ind. App. 555, 109 N. E. 530, 111 N. E. 342, the Appellate Court of this state, in an able opinion by Hottel, J., discussed the provisions of the act cited, and construed the grant in the light of the provisions of the statute under which it was made. The decision is based on the proposition that grants of public lands, being purely statutory, should be construed by the courts with reference to the statutes under which they are made, and that public officers in disposing of the lands of the state have no authority other than such as is conferred by positive statute. The conclusion

reached in that case was that the grants made by the state under the provisions of the act in question conveyed only the lands set off and bounded by the meander lines shown on the plat.. The conclusion reached is supported by the authority of *State* v. *Portsmouth Savings Bank, supra; Tolleston Club* v. *Lindgren* (1906), 39 Ind. App. 448, 77 N. E. 818, and many other authorities cited in the opinion. After the decision by the Appellate Court, a petition to transfer the case to this court was filed under the provisions of the statute on that subject. After a careful consideration of the questions involved this court denied the petition to transfer, thus giving to the opinion the sanction of this court. Upon further consideration, this court is convinced that the question here involved is correctly decided by the Appellate Court in the case to which we have referred. The opinion is well considered and the reasons advanced support the conclusion reached. The court accordingly holds, following *State* v. *Tuesburg Land Co., supra,* that the grant from the state to the remote grantor of appellee included only the land set off by the meander line, and that such line constituted the southern boundary of the land granted. That being true, appellee derived no title to any land south of that line by the chain of conveyances under which she claims.

The court is not unmindful of the fact that a different rule was announced in the case of *Tolleston Club, etc.* v. *State, supra,* and in some later cases which followed that decision. In these cases the rule announced in *Stoner* v. *Rice, supra,* was applied to grants made by the state under the provisions of the Swamp Land Act of 1852, but it does not appear that the provisions of that act were called to the attention of the court, or that they were considered in arriving at the result reached by any of such decisions. It is certain that the provisions of the statute are not re-

ferred to or discussed in any of the opinions to which
we refer, and we are justified in the conclusion that
those decisions were rendered without considering the
statute or giving weight to its provisions.    In other de-
cisions where the statute was given consideration, a dif-
ferent rule was applied.   *State* v. *Portsmouth Savings
Bank, supra; Tolleston Club* v. *Lindgren, supra; State*
v. *Tuesburg Land Co., supra.*   In view of the conflict
in this state, the court does not feel bound by the doc-
trine of *stare decisis* to adhere to any rule on this sub-
ject; but, on the contrary, feels free to adopt the rule
which is supported by the better reason.    In so far as
the opinion in the cases of *Tolleston Club, etc.* v. *State,
supra,* and the opinions in later cases based thereon,
conflict with the rule herein stated, the same are hereby
overruled.

The verdict of the jury finds in favor of appellee,
Isabella Carson, as against the Tolleston Club as to all
of the real estate described in her complaint, including
that portion lying south of the meander line, and the
judgment follows the verdict.    From what has been said
it appears that the verdict of the jury on the issue
formed between those parties was contrary to law, and
that the motion of the Tolleston Club for a new trial
should have been sustained.    The judgment as to the
Tolleston Club is therefore reversed, with directions to
sustain its motion for a new trial.

The questions presented by the assignments of error
by appellant Walker depend for decision on the con-
struction to be given to the quitclaim deed and the ef-
fect to be given to the tax deed, reference to which is
made in a former part of this opinion.

The trial court construed the quitclaim deed as con-
veying to Walker an undivided interest amounting to
five acres in the land described in the complaint, and
held that the tax deed was insufficient to convey title,

and determined the amount due for which Walker was entitled to a lien, and directed the jury to return a verdict accordingly. The court was correct in its construction of the quitclaim deed and in its finding with reference to the effect of the tax deed; but the verdict returned in obedience to the court's instruction finds that Walker is the owner of an undivided interest amounting to five acres in the entire tract described in the complaint including the part lying south of the meander line; and it also found that he was entitled to a lien against the same land which he was entitled to have foreclosed. The verdict for the reasons heretofore stated is contrary to law, and the motion of appellant Walker for a new trial should have been sustained.

The judgment is therefore reversed as to appellant Walker, with instructions to grant a new trial.

NOTE.—Reported in 123 N. E. 169. See note 61 App. 608.