Michael A. HOOSE and Darlene S. Hoose, Appellants–Plaintiffs,

v.

William H. DOODY and Judith A. Doody, Appellees–Defendants.

No. 43A03–0708–CV–420.

Court of Appeals of Indiana.

May 16, 2008.

Stephen R. Snyder, Randall L. Morgan, Snyder, Birch & Morgan LLP, Syracuse, IN, Attorneys for Appellants.

Richard K. Helm, Rockhill Pinnick LLP, Warsaw, IN, Attorney for Appellees.

## OPINION

CRONE, Judge.

### Case Summary

Michael A. Hoose and Darlene S. Hoose appeal the judgment on their complaint against William H. Doody and Judith A. Doody, denying the Hooses' request for a declaration of ownership and injunctive relief. We affirm.

### Issues

The Hooses raise two issues, which we restate as follows:

I. Whether the trial court erred in finding that the Hooses do not

possess record title to the subject real estate;

II.  Whether the trial court erred in finding that the Hooses failed to establish their claim for adverse possession; and

III. Whether the Hooses waived their prescriptive easement claim.

**Facts and Procedural History**

On March 19, 1946, William E. Osborn, Donna S. Osborn, and Garrett Osborn recorded the Plat of Osborn's Subdivision ("the Plat") in the Kosciusko County recorder's office. By warranty deed dated August 28, 1952, and recorded September 12, 1952 ("the Warranty Deed"), Michael Hoose's parents obtained title to real estate located in the Plat. The Warranty Deed provided in relevant part:

This Indenture Witnesseth, That William E. Osborn, Donna A. Osborn, Garrett A. Osborn and Margaret F. Osborn of Kosciusko County, in the State of Indiana Convey and Warrant to F. Dan and Floma M. Hoose, husband and wife of Madison County, in the State of Indiana, for and in consideration of One Dollar and other considerations------ Dollars, the receipt whereof is hereby acknowledged, the following described Real Estate in Kosciusko County in the State of Indiana, to wit:

Lot No. Eight (8) of Osborn[']s Subdivision of Big Chapman Lake.

. . . .

The grantors convey to the above grantees, the proprietorship of the land directly between said lot and lake and agrees that no buildings or occupancy will be allowed thereon, subject to the Laws of the State of Indiana governing bodies of water. If said strip of land is ever vacated, owners of lot no. Eight (8) shall have priority of purchase.

Appellants' App. at 21. At trial, the Hooses introduced evidence that prior to the execution of the Warranty Deed, Michael's parents wrote checks made out to "Bill Osborn" indicating that such payment was for Lot 8 and others indicating that payment was for Lot 7. *Id.* at 109, 110.

On November 7, 2003, Stephen E. Sanchez conveyed title to Lot 9 in the Plat to a revocable trust established by the Doodys. Lot 9 is immediately adjacent to the eastern border of Lot 8.

To the north of Lots 8 and 9 is an area of land that abuts the shoreline of Lake Chapman. The parties do not dispute that the area directly north of Lot 9 is a dedicated park, and is designated as such on the Plat, to be used by any and all Osborn's Subdivision residents. The parties disagree as to whether the area directly north of Lot 8 ("the Disputed Area") is a dedicated park. A faint "7" is barely visible on the copies in the record of the Plat. *Id.* at 22; Plaintiffs' Ex. 4. On July 10, 1953, the owners of Osborn's Subdivision recorded an amended plat of Osborn's Subdivision. Appellants' App. at 24. This amended plat identifies the area north of Lot 8 as a dedicated park. *Id.* However, because not all the owners of the lots in Osborn's Subdivision had signed the amended plat, it was vacated on October 21, 1953. *Id.* at 105–6.

By personal representative's warranty deed dated February 28, 1997, the Hooses acquired title to the property owned by Michael's parents, and Michael filed an affidavit of survivorship on June 9, 2006. The Hooses maintained a pier in the Disputed Area.

In May 2006, the Doodys installed a pier that encroached on the Disputed Area. On September 13, 2006, the Hooses filed a verified complaint for declaratory and injunctive relief against the Doodys, alleging that the Warranty Deed conveyed exclu-

sive use of the Disputed Area to the Hooses and seeking a judgment declaring that they "have the exclusive right to occupy the [Disputed Area] and exclude others from the [Disputed Area]" and that "the Doodys must remove any and all improvements placed upon the [Disputed Area]." *Id.* at 11, 17. The Hooses also sought a permanent injunction enjoining the Doodys from maintaining or creating any form of encroachment upon the Disputed Area. *Id.* at 18–19.

On September 22, 2006, the Doodys filed an answer to the complaint and a counterclaim against the Hooses, claiming that the Disputed Area was a park to which they, as owners of a lot in Osborn's Subdivision, had a right to use.

Following a bench trial, the trial court issued an order on August 15, 2007, containing the following findings and conclusions:

### FINDINGS OF FACT

. . . .

4. The 1946 Plat of Osborn Subdivision, Book 3, Page 280A (Exhibit A), contains reservations as follows; "Proprietors reserve control of unplatted ground as a park" and "Platted ground is for the special use of the lot owners of the Plat."

5. The 1946 Plat . . . depicts, among other things, Lot[s] 8 and 9 (Hoose and Doody, respectively), an alley 10 feet in width along the north boundary of Lot[s] 8 and 9; and north of Lot 8, a numeral 7, north of Lot 9, the word "park", and separating Lot 6 from "park", a line. Further, the numeral 7 and the line separating Lot 7 and "park" have been scratched out, defaced, and otherwise removed.

6. No deed appears to ever have been issued for a property described as "Lot 7 Osborn Subdivision".

. . . .

11. The 1953 Amended Plat, although vacated, does represent and indicate the intentions of William E. Osborn, Garrett A. Osborn, Margaret F. Osborn, and Donna A. Osborn, three of whom are the original plat proprietors of Osborn Subdivision.

12. The Amended Plat depicts the area between Lot[s] 8 and 9 and Big Chapman Lake as both "park" and "boat landing" and does not separately indicate a roadway between Lot 10 and the park, that area being encompassed as a part of the park and boat landing.

. . . .

14. Residents and owners in Osborn's Landing have, since 1946, subsequently utilized the park and boat landing area north of Lots 8 and 9 for piers as well as for park and recreational purposes.

15. An Affidavit of Survivorship recorded June 9, 2006, and executed by Michael A. Hoose makes reference to Lot No. 8 of Osborn Subdivision, for purposes of transfer of real estate in the records of the County, and does not make any reference to either a purported Lot 7 or an area between Lot 8 and the waters of Chapman Lake.

. . . .

19. Defendants' Exhibit M, the tax assessment records for Dan F. Hoose and Floma M. Hoose, indicate that Mr. and Mrs. Hoose have been assessed for and paid taxes upon Lot 8 of Osborn Subdivision.

20. There are no assessment records or tax records indicating that Dan F. Hoose and Floma M. Hoose have paid taxes on any area of real estate other than Lot 8. The tax records indicate an

actual frontage of 50 feet and effective depth of 100 feet, which are consistent with the dimensions of the platted lot and not consistent with taxation of any portion north of Lot 8.

. . . .

25. The current Auditor's record, as represented by Plaintiffs' Exhibit 50, indicates that the area of Lot 7, park, and roadway depicted in the original 1946 Plat are now listed as "No Record".

. . . .

31. Phyllis Osborn, daughter-in-law of two of the original plat proprietors of Osborn's Landing, has at times, attempted to exercise dominion over parks and pier locations in the Plat of Osborn Subdivision. While she has been mistaken with regard to the scope of her control, she has, as a matter of "family knowledge", clearly perceived the area between Lot[s] 8 and 9 and the waters of Chapman Lake to be "Osborn Landing Park", as indicated in Defendants' Exhibit I.

. . . .

## CONCLUSIONS

1. Hooses have not provided any official record of ownership of the area north of Lot 8 in Osborn's Subdivision.

2. The recorded documents and testimony clearly indicate the intention for the original plat proprietors that Lot 7 be removed or erased or eliminated from the Plat and made a part of the park north of Lots 8 and 9.

3. Subsequent use by owners within Osborn Subdivision confirm the use of the area north of Lots 8 and 9 as park and boat landing.

4. No deed for a purported Lot 7, nor any deed for the area north of Lot 8 to the water's edge, has been produced and presumably none exists. Hooses do not have a deed for the real estate they are claiming.

5. Hooses have not carried their burden of proof under any claim for adverse possession, specifically, they have not provided:

a) Clear and convincing evidence of adverse possession;

b) Clear and convincing evidence of exclusive control over the area from Lot 8 to and including the waters of Chapman Lake, and have not exercised either actual or exclusive possession of that tract for any requisite period of time;

c) Any intent to claim full ownership of the tract has been nominally secret; the Affidavit of Survivorship does not mention this claim and would be expected to be included if intent to claim ownership existed at that time;

d) There has been no demonstration of intent to claim full ownership superior to the rights of others; at best, the Hooses have, at times, "run off" or badgered others in the neighborhood with regard to occupancy, but without any specific declaration or claim of claim of ownership; and

e) There was no active or constructive notice of the Hooses' intent or exclusive control; no visible exclusivity of occupancy of a nature open, notorious, and hostile to all others in the Subdivision.

6. In addition, Hooses have not satisfied the statutory requirements of payment of taxes. The records of the Auditor do not reflect taxes being assessed on any of the park north of Lots 8 and 9; Hooses' deed has never been interpreted by the Auditor, Assessor, or Treasurer to include ownership of anything north

of Lot 8 or tax of anything north of Lot 8.

7. The area north of Lot 8 and 9, as described in Exhibit 50 [the current Auditor's record], is reserved in the plat and by historical usage as a park and boat landing.

8. Neither Hooses nor Doodys have any exclusive right to place a pier on the park and boat landing area described in Exhibit 50, but may continue to do so in coordination and cooperation with other neighbors, and other piers of owners, within the Subdivision.

9. [The Warranty Deed] contains language which restricts buildings or occupancy on the [Disputed Area], which may be concluded to be a restrictive covenant against construction of structures between Lot 8 and the lakeshore as descriptive and explanatory of the term "proprietorship."

10. Use of the reference to vacation, and specifically the word "vacated", implies some other ownership or interest in the strip of land which would have to be removed before the owners of Lot 8 could exercise their "priority of purchase."

11. The receipts for payment of money for Lot 7 may be understood to be a purchase of the restrictions of no buildings, and the option to honor "priority of purchase" if vacated.

12. The Osborn's Landing documents, taken as a whole, indicate a clear intention that Lot 7 was, in fact, removed or erased from the plat and intended to be part of a park and boat landing area.

. . . .

14. Hooses are not entitled to a declaration of ownership of the area north of Lot 8; absent ownership, the Hooses have no basis for an injunction or injunctive relief, having no separate title in the park/boat landing, nor any separate specific right to preclude others from the same pier use as the Hooses have utilized.

*Id.* at 7, 9. The Hooses appeal.

**Discussion and Decision**

We employ the following standard of review:

> When, as here, the trial court enters findings of fact and conclusions of law, its findings and conclusions shall not be set aside unless clearly erroneous. A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made. We review the judgment by determining whether the evidence supports the findings and whether the findings support the judgment. We consider only the evidence favorable to the judgment and all reasonable inferences to be drawn from that evidence. We neither reweigh the evidence nor assess witness credibility.

*Shady v. Shady,* 858 N.E.2d 128, 140–41 (Ind.Ct.App.2006) (citations and quotation marks omitted), *trans. denied* (2007).

■■■ We also note that the Hooses are appealing from a negative judgment. A party who had the burden of proof at trial appeals from a negative judgment and will prevail only if it establishes that the judgment is contrary to law. *Helmuth v. Distance Learning Sys. Ind., Inc.,* 837 N.E.2d 1085, 1089 (Ind.Ct.App.2005). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead only to one conclusion, but the trial court reached a different conclusion. *Id.*

*I. Record Title*

■■■ The Hooses challenge conclusions 1, 4, and 14, arguing that the War-

ranty Deed is unambiguous and contains "sufficient language to convey title to [the Disputed Area] to Mr. Hoose's parents." Appellants' Br. at 18. In reviewing this contention, we observe that "[t]he object of deed interpretation is to identify and implement the intent of the parties to the transaction as expressed in the plain language of the deed." *Parkison v. McCue*, 831 N.E.2d 118, 128 (Ind.Ct.App.2005), *trans. denied.* "We presume that the parties intended for every part of a deed to have some meaning, and we favor a construction that reconciles and harmonizes the entire deed." *Id.* "We read the language of real covenants in the ordinary and popular sense, and not in a technical or legal sense." *Id.* "If the terms of the deed are not ambiguous, we apply them according to their clear and ordinary meaning." *Id.* Where the language of the deed is ambiguous, we may consider extrinsic evidence to ascertain the intent of the parties. *Kopetsky v. Crews*, 838 N.E.2d 1118, 1124 (Ind.Ct.App.2005). "A deed is ambiguous if it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Id.*

■ We cannot agree that the Warranty Deed unambiguously conveys title to the Disputed Area to Mr. Hoose's parents. On the one hand, it conveys "the propri-

etorship of the land directly between said lot and lake." Appellants' App. at 21. The Hooses contend that the aforementioned language conveys ownership, citing, *inter alia, Richardson v. Citizens Gas & Coke Utility*, 422 N.E.2d 704, 711 (Ind.Ct. App.1981). However, the Hooses' suggested interpretation of "proprietorship" conflicts with other language in the Warranty Deed, which provides, "If said strip of land is ever vacated, owners of lot no. Eight (8) shall have priority of purchase." Appellants' App. at 21. In an attempt to reconcile the aforementioned language, the Hooses argue that the priority of purchase language applies to a narrow alley depicted on the Plat between Lot 8 and the Disputed Area. *Id.* at 22.[1] Alternatively, they argue that the priority of purchase language is mere surplusage "since the Hooses would already own the underlying fee to the alley by virtue of the 1952 Warranty Deed without the need to initiate any vacation proceeding." Appellants' Br. at 19.

We find these arguments unpersuasive. The Warranty Deed grantors clearly knew how to convey ownership and would have used the same language with regard to the Disputed Area as they used for Lot 8 had they intended to convey ownership of the Disputed Area.[2] To harmonize the lan-

---

1. The dissent agrees with this argument. Op. at 98. However, no piece of property other than Lot 8 and the Disputed Area—"the land directly between said lot and lake"—is identified in the Warranty Deed. Further, the use of "said" as an adjective is commonly understood to refer to the item just mentioned. *See* WEBSTER'S THIRD NEW INTERNAT'L DICTIONARY 2000 (2002) (defining "said" when used as an adjective as "aforementioned"). Thus, "said strip of land" must refer to "the land directly between said lot and lake[.]" Even if the drafting of the Warranty Deed is less than perfect, we cannot read "said strip of land" as referring to a piece of property not identified in the deed. Therefore, the Warranty Deed

provides that if the Disputed Area is ever vacated, then the grantees will have priority of purchase. Because it is illogical to convey both ownership of and a priority to purchase the same piece of property, the Warranty Deed grantors must have intended to convey something less than fee simple ownership of the Disputed Area to Mr. Hoose's parents.

2. The dissent states that "proprietorship" was used because the Disputed Area was adjacent to a body of water. Op. at 97. However, the term "proprietorship" is not the only difference; the entire style and structure of the language used to convey fee simple ownership of Lot 8 is entirely different from that applied

guage of the Warranty Deed, we must conclude that "proprietorship" is not fee simple ownership. We agree with the trial court's determination that the "proprietorship" conveyed by the Warranty Deed was akin to a restrictive covenant in which the grantors promised not to erect buildings on or allow occupancy of the Disputed Area.

While we conclude that the terms of the Warranty Deed are not ambiguous and reveal that the intent of the parties was not to convey fee simple ownership of the Disputed Area to the Hooses, the dissent reaches the opposite conclusion. These contrary conclusions do not render the Warranty Deed ambiguous. However, even if it were considered ambiguous, we would conclude that extrinsic evidence supports our reading of the Warranty Deed because the evidence in the record before us establishes that the Disputed Area was intended as a park.

The trial court examined the Plat in the recorder's office and found that the numeral 7 and the line separating it from the adjacent "park" had been scratched out, defaced, and otherwise removed. Appellees' App. at 6; Appellants' App. at 4, 7. This erasure implies that the Disputed Area was intended to be included in the park. Moreover, the amended plat of Osborn's Subdivision clearly labels the Disputed Area as a dedicated park. Appellants' App. at 24. The subsequent cancellation of the amended plat due to insufficient owner signatures does not eclipse the importance of the amended plat as evidence of the original owners' intent—three of the four signatories to the Plat had signed it.

Also, the evidence demonstrates that the historical understanding and use of the Disputed Area was as a park. Residents of the subdivision testified that it was the understanding of the community that the Disputed Area was a park and that adults and children of the subdivision used the Disputed Area over the years for recreational purposes and for social gatherings such as bonfires and that the Hooses never ordered anyone off the property. Appellees' App. at 19, 21–23, 25. Also, Stan Osborn[3] testified that his mother, Phyllis Osborn, historically took an active role supervising the parks, and he identified a letter containing his mother's signature that gave permission to build a pier in an area marked Osborn's Landing Park. *Id.* at 26, 30–31; Ex. I. Osborn's Landing Park includes the Disputed Area. *Id.* at 31; Ex. I.

Thus, in addition to the plain language of the Warranty Deed, the extrinsic evidence also establishes that the signatories to the Plat intended to reserve the Disputed Area as a park and the community members used it as such. The signatories of the original Plat are identical to the grantors in the Warranty Deed. Therefore, the grantors must have intended to convey something less than fee simple ownership to the Hooses. In the Warranty Deed, the grantors promised not to erect any buildings or structures on the Disputed Area, which is consistent with their intention to maintain the Disputed Area as a park. Their intent to reserve the Disputed Area as a park is also consistent with the priority of purchase granted in the Warranty Deed. Finally, we observe that the affidavit of survivorship filed by Michael Hoose

to the Disputed Area and cannot be explained based solely on the Disputed Area's relationship to water.

**3.** William and Donna Osborn were Stan's grandparents, and Garrett Osborn was Wil-

liam's brother, all of whom were named as grantors in the Warranty Deed and were signatories to the Plat.

identifies only Lot 8 and omits any reference to Lot 7. Appellants' App. at 25. The most likely explanation for Mr. Hoose's failure to identify Lot 7 in the affidavit is that his parents did not in fact own it. Therefore, the trial court's conclusion that the Hooses did not provide any official record demonstrating their ownership of the Disputed Area is not clearly erroneous.[4]

## II. Adverse Possession

■■■ The Hooses argue that the trial court erred in finding that they did not acquire title to the Disputed Area by adverse possession. In *Fraley v. Minger*, 829 N.E.2d 476, 486 (Ind.2005), our supreme court rephrased the elements of adverse possession, providing that "the doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration[.]" Under the rephrased adverse possession elements, the control element takes into account the former elements of actual and exclusive possession. *Id.* Evidence of intent will reflect the former elements of claim of right, exclusive, hostile, and adverse possession. *Id.* The notice element covers the former visible, open, notorious, and in some ways hostile elements. *Id.* And finally, the duration element is a restatement of the continuous element. *Id.* These elements must be satisfied for a period of ten years. *Ballard v. Harman*, 737 N.E.2d 411, 416 (Ind.Ct.App. 2000) (citing Ind.Code § 34–11–2–11). In addition, Indiana Code Section 32–21–7–1 requires the claimant or adverse possessor to pay and discharge "all taxes and special assessments that the adverse possessor or claimant *reasonably believes in good faith*

*to be due on the land or real estate* during the period the adverse possessor or claimant claims to have possesses the land or real estate adversely." (Emphasis added.)

■■■ The Doodys assert that the Hooses did not pay taxes on the Disputed Area and therefore failed to comply with Section 32–21–7–1. The Hooses argue that they did not fail to comply with the adverse possession tax statute because the auditor did not include Lot 7 on the tax rolls, and consequently "no tax payments fell due on Lot 7 requiring payment by any person." Appellants' Br. at 29. Implicit in the Hooses' argument is an acknowledgement that they knew they were paying taxes for Lot 8 only and not for Lot 7. Michael Hoose's testimony is relevant in this regard:

Q. I asked you about deeds. Do you have any receipt from the County Treasurer for payment of taxes that specifically mention Lot 7?

A. Not with the number 7 on it, no.

Q. Look at Exhibit 49 [5] please. It says property card report.

A. Yes.

Q. Your property card report says that this is a tax assessment for Lot 8, Osborn's Subdivision, correct?

A. That's correct.

Q. Does it say anywhere that you are paying extra for part of Lot 7?

A. No.

Q. Or for property in front of Lot 8?

A. No.

Appellants' App. at 83.

Indiana Code Section 32–21–7–1 requires that the claimant pay all taxes that

---

4. Having found that the trial court did not err in concluding that the Hooses did not possess record title to the Disputed Area, we need not address the Hooses' contention that they pos-

sessed record title to the Disputed Areas based upon the Marketable Title Act.

5. Appellants' App. at 121.

the "claimant *reasonably believes in good faith to be due* on the land[.]" The Hooses owned Lot 8 and paid property taxes on it; therefore, they could not reasonably have believed in good faith that they both owned Lot 7 and did not have to pay taxes on it. Indeed, they offer no evidence that it would have been reasonable to believe that a lot privately owned by them would be exempt from property taxes and assessments. Accordingly, the trial court did not clearly err in finding that the Hooses have not satisfied the adverse possession tax statute.

### III. Waiver of Prescriptive Easement Claim

■ Finally, the Hooses contend that the trial court erred in finding that the Hooses lack "any specific right to preclude others from the same pier use as the Hooses have utilized." *Id.* at 9. The Hooses argue that they acquired a prescriptive easement across the Disputed Area that "allows for their continued exclusive use of the riparian rights accompanying [it]." Appellants' Br. at 29. The Doodys assert that the Hooses waived the argument because they failed to argue it before the trial court. We agree with the Doodys.

"A party generally waives appellate review of an issue or argument unless the party raised that issue or argument before the trial court." *GKC Ind. Theatres, Inc. v. Elk Retail Investors, LLC.*, 764 N.E.2d 647, 652 (Ind.Ct.App.2002). The Hooses do not contend that they presented this argument to the trial court. However, they assert that they did not waive this argument because they alleged the operative facts of their claim in accordance with notice pleading requirements of Indiana Trial Rule 8. However, even if the Hooses alleged all the facts necessary to establish a claim for prescriptive easement in their complaint, that alone is insufficient to preserve the issue for appellate review. Our

supreme court has stated that "[a]t a minimum, a party must show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal." *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004). This requirement is justified by important policy reasons, including the "preservation of judicial resources, opportunity for full development of the record, utilization of trial court fact-finding expertise, and assurance of a claim being tested by the adversary process." *Id.; see also McGill v. Ling*, 801 N.E.2d 678, 687–88 (Ind.Ct.App.2004) (holding that where McGill's designated evidence contained facts underlying class action tolling issue, McGill had nevertheless waived issue because she had failed even to mention or reference her class action tolling argument at summary judgment), *trans. denied; but cf. United Farm Bureau Mut. Ins. Co. v. Lowe*, 583 N.E.2d 164, 168 (Ind.Ct.App. 1991) (holding that although Lowes did not raise equal protection/equal privileges claim before the trial court, claim was not waived where Lowes' position before the trial court included a claim that Farm Bureau's interpretation of the statute would establish unfair classifications of policyholders and that policyholders should be treated alike, and therefore Farm Bureau had notice and opportunity to defend against it and court would alternately address it as an equal protection/equal privileges claim), *trans. denied* (1992).

■ The Hooses also assert that it is appropriate for us to consider whether they established a prescriptive easement because the trial court adopted the Doodys' proposed findings of fact and conclusions thereon and found that the Hooses have "no separate title in the park/boat landing, **nor any separate specific right to preclude others from the same pier use as the Hooses have utilized.**" Appel-

lants' Br. at 17 (appellants' emphasis). They claim a prescriptive easement is a separate specific right, citing *Bromelmeier v. Brookhart*, 570 N.E.2d 90, 92 (Ind.Ct. App.1991), *trans denied.* While it may be that a prescriptive easement is a kind of separate specific right, the inclusion of this single phrase, which makes no reference to the term "prescriptive easement", in an eight-page order gives us no comfort that the trial court considered that particular theory and rejected it.

■■■■■ Finally, the Hooses contend that the reformulated elements of an adverse possession claim generally apply to a claim for a prescriptive easement. This is true except as to those differences between fee interests and easements. *Wilfong v. Cessna Corp.*, 838 N.E.2d 403, 406 (Ind.2005). Those differences are such that evidence supporting adverse possession is not necessarily the same as that establishing a prescriptive easement. For example, the statutory period required to establish adverse possession is ten years, but the statutory period required to establish a prescriptive easement is twenty years. Ind.Code §§ 34–11–2–11, 32–23–1– 1. In addition, to establish adverse possession, "the claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land." *Fraley*, 829 N.E.2d at 476. To establish a prescriptive easement, the claimant must use or exercise control of the land for a specific purpose. *See* BLACK'S LAW DICTIONARY 548 (8th ed. 1999) (defining easement as "[a]n interest in land owned by another person, consisting of the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road)").

In this case, the evidence was directed toward normal and customary use of the Disputed Area, such as the Hooses' con-

struction of concrete steps and the Hooses' family activities. The Doodys countered with evidence of neighborhood bonfires and children playing in and walking across the Disputed Area. However, evidence specific to the shoreline is required to establish that the Hooses have the right to exclude other residents of the subdivision from building piers along the shoreline of the Disputed Area. The Doodys claimed that the Disputed Area was a dedicated park available to all residents, including access for placements of piers. Thus, while Mr. Hoose testified that his family first built a pier in 1952 and has maintained it to the present, such evidence is not relevant as to whether other residents were on notice that Hooses intended to exercise exclusive control of the shoreline. Accordingly, we conclude that the Hooses have not preserved their prescriptive easement claim by presenting an adverse possession argument to the trial court.

Based on the foregoing, we affirm the trial court's judgment.

Affirmed.

NAJAM, J., concurs.

BAILEY, J., dissents with separate opinion.

BAILEY, Judge, dissenting.

I respectfully dissent because I believe that the language of the Warranty Deed conveyed the Disputed Area to Michael Hoose's parents in fee simple. The construction of the terms of a written contract is a pure question of law for the court, reviewed *de novo. Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind.2002). Under *de novo* review, no deference is owed to the conclusion of the trial court. *Tankersley v. Parkview Hosp., Inc.*, 791 N.E.2d 201, 204 (Ind.2003).

The goal of construing a deed is to ascertain the intent of the parties. *Clark v. CSX Transp., Inc.*, 737 N.E.2d 752, 757 (Ind.Ct.App.2000), *trans. denied.* The intent of the parties to a real estate transaction is formed at the consummation of their agreement. This intent governs the extent of the interest conveyed. *Richard S. Brunt Trust v. Plantz*, 458 N.E.2d 251, 252 (Ind.Ct.App.1983).

In construing a deed, we do not venture outside of the four corners of the deed to discern the intent of the parties unless the language creates an ambiguity. *Poznic v. Porter County Dev. Corp.*, 779 N.E.2d 1185, 1190 (Ind.Ct.App.2002). If ambiguity exists, then we may resort to extrinsic evidence, sources of information other than the language of the deed, to ascertain the intent of the parties. *Kopetsky v. Crews*, 838 N.E.2d 1118, 1124 (Ind.Ct.App.2005). If the terms of the deed are not ambiguous, we apply them according to their clear and ordinary meaning. *Keene v. Elkhart County Park and Recreation Bd.*, 740 N.E.2d 893, 897 (Ind.Ct.App.2000). In construing a deed, we presume that the parties intended every part of a deed to have some meaning, and we favor a construction that reconciles and harmonizes the entire deed. *Parkison v. McCue*, 831 N.E.2d 118, 128 (Ind.Ct.App.2005), *trans. denied.*

In uncovering the intent of parties to a deed, we utilize a variety of tools not the least of which is grammatical construction. Nevertheless, in some instances the intent of the parties cannot be ascertained merely by the mechanical application of grammatical rules. Rather, in examining the document as a whole, we look for other clues that are readily apparent for our consideration. Thus, in addition to employing rules of grammar, we also consider the language chosen in its historical context because a word's meaning can change over time. When construing older documents, we should be wary of assigning a contemporary meaning to a word or dismissing it entirely. Moreover, the character of the land that is the subject of the transaction may also serve as a basis for the selection of a particular term by the parties. Ultimately, in discerning the intent of the parties by construing the deed, no particular rule predominates over another, rather, these rules should be thoughtfully used so as to reconcile and harmonize the entire deed.

The Warranty Deed reads in relevant part:

> This Indenture Witnesseth, that William E. Osborn, Donna A. Osborn, Garrett A. Osborn and Margaret F. Osborn ... Convey and Warrant to F. Dan and Floma M. Hoose ... the following described Real Estate in Kosciusko County in the State of Indiana, to wit:

> Lot No. Eight(8) of Osborns Subdivision of Big Chapman Lake.

> . . . .

> The grantors convey to the above grantees, the proprietorship of the land directly between said lot and lake and agrees [sic] that no buildings or occupancy will be allowed thereon, subject to the Laws of the State of Indiana governing bodies of water. If said strip of land is ever vacated, owners of lot no. Eight(8) shall have priority of purchase.

The construction of the last paragraph is crucial in determining whether the Hooses have record title to the Disputed Area. In utilizing the various rules of construction to discern the intent of the parties, I believe that this language unambiguously conveys Lot 8, the Disputed Area with a restrictive covenant, and provides for a right of first refusal for the purchase upon the vacation of the only strip of land between Lot 8 and the lake not otherwise

conveyed to the Hooses, i.e., the alley in between the two lots.

First, the ordinary meaning of "convey" is to transfer or deliver something, usually a right or property, to another. *See* Black's Law Dictionary 357 (8th ed. 2004). A "restrictive covenant" is not a right or property but a promise to restrict the use or occupancy of real property. *See* Black's Law Dictionary 393 (8th ed. 2004). Utilizing these definitions, the majority's conclusion, adopting the trial court's interpretation, implies that the Warranty Deed transfers a restrictive covenant to the grantees.[6] However, a conveyance of an interest in real estate is necessary before one has a right to be upon the property. The restrictive covenant without the conveyance of a right to be upon the property in the first instance does not make sense, and as discussed infra, the word "proprietorship" conveys an interest in land greater than a mere license or easement. Therefore, I believe that the conclusion that the Warranty Deed conveys a restrictive covenant does not comport with the generally understood terminology used in property law. Rather, based on the use of the terms "convey" and "proprietorship," I am convinced that the more fitting conclusion is that the Warranty Deed transferred the Disputed Area to the grantees in fee simple.

The term proprietorship and its derivations are synonymous with ownership. *See* 26A C.J.S. *Deeds* § 8 (2001) ("Proprie-

tary and Owner": The word "proprietary" is consistent with the word "owner."); Black's Law Dictionary 1256 (8th ed. 2004) ("Proprietary"—1. Of or relating to a proprietor. 2. Of, relating to, or holding as property, "Proprietor"—An owner, esp. one who runs a business.—proprietorship); *Parkison*, 831 N.E.2d at 130 ("Where lands are overflowed and submerged, and within a reasonable time the waters retire and the land reappears, the title of the owner is not disturbed, and the *proprietorship* remains in the original owner." (emphasis added) Quoting *Payne v. Hall*, 192 Iowa 780, 185 N.W. 912 (1921), in addressing the issue of whether a *fee holder regains his title* after his original land has eroded away and then reappears through accretion.); *Reinking v. Metro. Bd. of Zoning Appeals of Marion County*, 671 N.E.2d 137, 141 (Ind.Ct.App.1996) ("We are not determining that subsequent owners of tax sale property are not entitled to raise constitutional issues that arise during their *proprietorship*." (emphasis added)). Moreover, the term proprietor is commonly used in the area of riparian rights, including the time period when the Warranty Deed was drafted. *See City of Elkhart v. Christiana Hydraulics*, 223 Ind. 242, 256, 59 N.E.2d 353, 358 (1945) ("An upper riparian owner may not use or divert water from a stream in such a way as to destroy or render it unavailable for the use of a lower riparian proprietor." [Note the interchanging use of the terms owner

---

**6.** In supporting its conclusion that the Warranty Deed conveys a restrictive covenant and the right of priority of purchase of the Disputed Area, the trial court concludes that the evidence of payments made towards the Disputed Area "may be understood to be a purchase of the restrictions of no buildings, and the option to honor 'priority of purchase' if vacated." Appellant's Appendix at 8. Even assuming we needed to look beyond the four corners of the Warranty Deed, it belies logic that a person would pay for the opportunity

to restrict himself from building any structures on a property in which he has no interest. Furthermore, the checks made as "payment on Lot #7" provide no clue as to whether the Warranty Deed conveyed a priority of purchase as to Lot 7 or the conveyance of Lot 7 with the priority of purchase for the alley. See Plaintiff's Exhibits 10 and 11. The checks simply provide no indication as to exactly what interest in Lot 7 Dan Hoose was supposed to receive in return for the payments.

and proprietor] ); *Millspaugh v. NIPSCO,* 104 Ind.App. 540, 12 N.E.2d 396, 400 (1938) ("It has been held that the fact that a private stream has been stocked by the state does not give others than riparian proprietors any right to take fish from the water."); *Tolleston Club of Chicago v. Carson,* 188 Ind. 642, 123 N.E. 169, 174 (1919) ("In cases where it appeared that lakes or other nonnavigable waters of circular or irregular shapes were meandered, and bordering lots on all sides were owned by different persons, it became manifest that the title of each adjoining proprietor could not extend to the center of the body of water without overlapping."); *State v. Ohio Oil Co.,* 150 Ind. 21, 49 N.E. 809, 814 (1898) ("While the right of fishery upon his own land is exclusively in the riparian proprietor, this does not imply or carry the right to destroy what he does not take."). These definitions and usage of the term in the common law further support the conclusion that the language of the Warranty Deed constitutes the conveyance of the Disputed Area, because such a conveyance would include riparian rights based on the lot's proximity to the lake. In my opinion, the topographic characteristics of the lots explain the choice of the differing terms used to convey these lots to the Hooses.

Thus, taking the document as a whole, the term "proprietorship," meaning ownership, is in harmony with the Warranty Deed's usage of the term "convey," meaning to transfer a right or property and the subsequent language establishing a "restrictive covenant," i.e., a reservation on the owner's right restricting the use and quiet enjoyment of the property to which the promisor would otherwise be permitted. Clearly, it does not follow that there would be a restriction in the use of the

Disputed Area without first having a right or interest therein. I am satisfied that there is no ambiguity in this conveyance, and the clear and ordinary meaning of the language demonstrates the intention of the parties to convey ownership of the Disputed Area, "the land between said lot [8] and [the] lake," along with a restrictive covenant as to the use of the land.

Furthermore, these provisions can be harmonized with the subsequent sentence regarding the right to priority of purchase. It is undisputed that there is a ten-foot alley set off from the Disputed Area and adjacent to Lot 8, as indicated on the plat. The term "vacate" in reference to a thoroughfare signifies the statutory procedure of privatizing a public street or alley. *See* Ind.Code § 36–7–3–12; *Smith v. City of Shelbyville,* 462 N.E.2d 1052, 1055 (Ind.Ct. App.1984) ("Vacation of public ways is an integral part of planning and development."). The character of this narrow portion of land "between the lot and the lake" easily fits the description "strip of land." As it was dedicated to public use when the subdivision was platted, the grantors could not convey the alley. Thus, I believe that the sentence should be interpreted to mean that if the public alley between the Disputed Area and Lot 8 is released from public ownership, the owners of Lot 8 have priority in purchasing that strip of land.[7]

I acknowledge the majority's application of grammatical rules would indicate that the phrase "said strip of land" refers back to the phrase "the land directly between said lot and lake." Relying upon this single phrase and its placement within the Warranty Deed, the majority reaches its conclusion regarding the intent of the parties despite all of the other indicators of

---

7. Today, there is a presumption that when a street is vacated or abandoned the title to the land reverts to the abutting property owners.

*See Gorby v. McEndarfer,* 135 Ind.App. 74, 82, 191 N.E.2d 786, 791 (1963).

intent. Nevertheless, I do not believe there is such a connection between these phrases because there is no commonality in their reference to the land. The first phrase simply refers to "the land," and the second, supposed antecedent phrase, says, "said *strip of* land" (emphasis added). Furthermore, we cannot be so myopic in the interpretation of a deed that we exclude the other terms employed. It is my view that the mechanical application of this grammatical principle does not evidence the intent of the parties but simply establishes that the sentence was poorly drafted. If the sentences were a part of an English composition assignment, the scrivener would not receive a passing grade. However, the aim in interpreting contracts and deeds is greater than just applying rules of grammar to the words in the document before us. Thus, we must take a step back to view the entire document and seek to harmonize all of the terms and phrases used rather than honing in on one phrase in the deed to determine the result in this case.

It is our duty to discern the intent of the parties in construing the Warranty Deed. Though certain sentences cause me pause and could have been better written, the clues found elsewhere in the document leave me satisfied that the parties intended to convey to the grantees Lot 8, the Disputed Area with a restrictive covenant, and a right of first refusal provision as to the alley in between the two lots.[8] This construction gives meaning and effect to all of the terms and phrases employed as well as reconciling and harmonizing the entire deed. Because the trial court's interpretation fails to do this, I would reverse the trial court. For these reasons, I respectfully dissent.

---

8. This construction also eliminates the need to concern ourselves with the payment of taxes on the Disputed Area because the issue of taxes is relevant only in the context of a claim for adverse possession. Where, as here, the property was purchased and the deed recorded, it is up to the county to determine the property values, and therefore, the tax to be paid. Whether this was done and whether the tax was paid would be of no consequence in these proceedings.